OPINION
James, Diane, and Laura Liming and Kenneth Smith (hereinafter collectively referred to as "the Limings") appeal from a judgment of the Greene County Court of Common Pleas, which found that the Greene County Agricultural Society ("the Society") was immune from liability pursuant to R.C. Chapter 2744 for matters arising out of its sponsorship of the Greene County Fair.
This case arose from a dispute over the eligibility of a hog, Big Fat, to compete in the 1996 Greene County Fair. Big Fat was entered in the fair by Laura Liming, who was seventeen years old, as part of a project for the 4-H Club. James and Diane Liming are her parents. At the July 1996 Fair, Big Fat won the honor of "Reserve Grand Champion," the second highest award for a hog. Two months later, Larry Mangan, the President of the Society, began an investigation into whether Big Fat had been purchased by the Limings after the May 15, 1996 purchase deadline for the Greene County Fair. After investigating the matter for several months, Mangan concluded that Big Fat had been shown at the Clinton County Fair in early July 1996, that the Limings had purchased the hog after the Clinton County Fair, and that the hog had thus been purchased after the deadline for purchasing hogs to be entered in the Greene County Fair in violation of Fair rules. Accordingly, in February 1997, the Society sanctioned the Limings by demanding that all ribbons and trophies awarded to the Limings on behalf of Big Fat be returned, that the Limings pay restitution in an amount equal to the difference between the hog's market price and the price paid for the hog, and that the Limings be barred from showing any livestock at the Greene County Fair for three years. The Society's actions were reported in theXenia Daily Gazette.
The Limings apparently did not comply with the Society's sanctions, and on April 30, 1997, the Society filed a complaint in the Greene County Court of Common Pleas alleging fraud and seeking the imposition of its sanctions, as well as $5,000 in compensatory damages and $15,000 in punitive damages. The Limings filed a Civ.R. 12(B) (6) motion to dismiss that was overruled by the trial court. On July 17, 1997, the Limings filed an answer, a counterclaim, and a third party complaint alleging that the Society and Mangan had defamed them and had violated their due process rights and seeking an injunction prohibiting the enforcement of the Society's sanctions against them.
On July 31, 1998, the Limings moved for summary judgment, alleging procedural errors in the Society's handling of the action that prohibited the trial court from considering the merits of the case. On August 3, 1998, the Society filed a motion for summary judgment alleging that it was immune from liability pursuant to R.C. Chapter 2744 on all of the Limings' claims. On September 30, 1998, the trial court sustained the Society's motion for summary judgment, finding that the Society was a political subdivision that had been engaged in a governmental activity, i.e., holding the Greene County Fair, when the alleged liability arose and that reasonable minds could not conclude that the Society's or Mangan's actions constituted malice, bad faith, or reckless conduct so as to preclude immunity. The trial court certified this decision pursuant to Civ.R. 54(B). On the same day, the trial court overruled the Limings' motion for summary judgment, finding that reasonable minds could differ as to whether the Limings had been denied due process. A jury trial was scheduled for December 7, 1998, on the issues contained in the Society's complaint.
The Limings filed a notice of appeal citing September 30, 1998, as the date of the judgment appealed. Although the Limings did not distinguish in their notice of appeal between the two judgments rendered on that date, they obviously intended to appeal from the trial court's finding that the Society was immune from liability. That decision was immediately appealable because it was a final order pursuant to R.C. 2505.02(B) (1) and included Civ.R. 54(B) certification. The Limings' first two assignments, however, address issues unrelated to the Society's immunity. In these assignments, which address the denial of the Limings' Civ.R. 12(B) (6) motion to dismiss and the denial of their motion for summary judgment based on the Society's alleged violation of their due process rights, the Limings attempt to appeal from decisions that were neither final nor appealable. Because no statutory authority exists for these interlocutory appeals and because these issues are reviewable on appeal after a final judgment has been entered, we will not consider the Limings' first two assignments of error.
The Limings' third assignment of error is as follows.
 III. THE TRIAL COURT ERRED IN SUSTAINING THE SOCIETY'S CIV.R. 56(C) MOTION FOR SUMMARY JUDGMENT.
The Limings contend that the trial court made three distinct errors in concluding that the Society was entitled to immunity under R.C. Chapter 2744. The Limings claim that the trial court erred in concluding that 1) the Society was a political subdivision; 2) the Society was engaged in a governmental function; and 3) Mangan did not act recklessly, with malice, or in bad faith in investigating the Limings. A discussion of the statutory scheme for determining whether an act is entitled to immunity from tort liability will be helpful to our discussion of this assignment of error.
R.C. 2744.02(A) (1) sets forth a general rule of immunity for political subdivisions, freeing them from liability in damages for injury, death, or loss to persons or property. Accordingly, the first question we must consider is whether the Society is a political subdivision so as to come within the scope of R.C. Chapter 2744. Once an entity is determined to be a political subdivision that is cloaked with immunity pursuant to R.C.2744.02(A) (1), the second tier of analysis is whether any of the five exceptions to immunity set forth in R.C. 2744.02(B) apply. The exception at issue in this case is set forth in R.C. 2744.02(B) (2), which provides that a political subdivision is liable for injury, death, or loss to persons or property caused by the negligent performance of acts by its employees with respect to proprietary, rather than governmental, functions of the political subdivision. The definitions of governmental and proprietary functions are set forth at R.C. 2744.01(C) and (G), respectively. Thus, if we determine that the Society is a political subdivision, the second issue we must consider is whether the Society was engaged in a governmental or proprietary function when it caused the alleged harm to the Limings. See, generally, Cater v. Cleveland (1998), 83 Ohio St.3d 24, 28. Third, if we find that the Society was a political subdivision engaged in a function for which it was otherwise immune, we must determine whether Mangan was liable personally based on any of the exceptions to immunity contained in R.C.2744.03(A) (6).
We begin by determining whether the Society is a political subdivision for purposes of R.C. Chapter 2744. A political subdivision is defined as "a municipal corporation, township, county, school district, or other body corporate and politic responsible for governmental activities in a geographic area smaller than that of the state." R.C. 2744.01(F). It is undisputed that the Society must be a "body corporate and politic" if it is a political subdivision at all because it is certainly not a municipal corporation, township, county, or school district. The Limings argue that the Society is not a "body corporate and politic" as that term was interpreted in Hamilton Cty. Bd. of Mental Retardation DevelopmentalDisabilities v. Professionals Guild of Ohio (1989), 46 Ohio St.3d 147, 150, ("Hamilton Cty. MRDD") because it does not have the "powers and duties of government" and does not act as an agent of the state, the county, a city, or a township. They also argue that the Society is not responsible for governmental activities.
R.C. Chapter 1711 provides for the organization of county agricultural societies and, in R.C. 1711.13, the legislature specifically provided that "[c]ounty agricultural societies are hereby declared bodies corporate and politic." We find this legislative pronouncement to be dispositive, and we are unpersuaded by the Limings' interpretation of Hamilton Cty. MRDD, supra, as requiring a body corporate and politic to act as an "agent" in the administration of civil government in some technical way. Moreover, the issue in Hamilton Cty. MRDD was whether the MRDD was a "person" pursuant to R.C. 119.01(F) and thus vested with a right to appeal a decision of the State Employment Relations Board. We are unpersuaded that the court's analysis in that case is relevant to the issue before us.
The Attorney General of Ohio has carefully analyzed the question of whether a county agricultural society is a political subdivision as defined in R.C. 2744.01(F). See 1988 Ohio Atty.Gen.Ops. No. 88-034. The Attorney General readily acknowledged that a county agricultural society was a body corporate and politic because it was so designated by the legislature and that a county agricultural society could exist only in a single county, and thus was "in a geographic area smaller than that of the state." Id. at 6-7. According to the Attorney General, the issue that deserved careful scrutiny was whether a county agricultural society was responsible for a governmental activity. We agree with this assessment.
The Attorney General noted that, while county agricultural societies possess some characteristics that suggest that their activities are not governmental, the primary purpose of such societies has repeatedly been identified as education of the public about agriculture. Id. at 7-8. The Attorney General observed that "[t]he promotion of educational goals traditionally has been regarded as an appropriate governmental activity," and cited numerous cases in support of that position. Id. at 8-9. Moreover, the Attorney General found that the Ohio Expositions Commission, which is a governmental agency, engages in essentially the same activities as county agricultural societies. Based on these observations, the Attorney General concluded that the activities of a county agricultural society are governmental activities for purposes of R.C. 2744.01(F) and that such societies are therefore political subdivisions. We find the Attorney General's reasoning to be persuasive, and we therefore conclude that a county agricultural society is a political subdivision for purposes of R.C. Chapter 2744. See, also, Randolph Twp. Trustees v. Portage Cty.Agricultural Society (June 30, 1992), Portage App. No. 91-P-2384, unreported (agricultural society is a body corporate and politic for purpose of classification as a political subdivision under R.C. Chapter 2744 for certain purposes).
We now turn to the question of whether the Society was performing a governmental or a proprietary function when the Limings were allegedly harmed. In addition to the designations in R.C. 2744.01(C) (2) and (G) (2) of specific functions as either governmental or proprietary functions, R.C.2744.01(C) (1) defines a function as a governmental function if it falls within any of the following categories:
 (a) A function that is imposed upon the state as an obligation of sovereignty and that is performed by a political subdivision voluntarily or pursuant to legislative requirement;
 (b) A function that is for the common good of all citizens of the state;
 (c) A function that promotes or preserves the public peace, health, safety, or welfare; that involves activities that are not engaged in or not customarily engaged in by nongovernmental persons; * * *.
Insofar as it is relevant to this appeal, a proprietary function is one "that promotes or preserves the public peace, health, safety, or welfare and that involves activities that are customarily engaged in by nongovernmental persons." R.C. 2744.01(G) (1) (b).
The trial court found that the Society was engaged in a governmental function because "the holding of a county fair by a county agricultural society is a function `that is for the common good of all citizens of the state.'" The Society claims that its sponsorship of the Fair satisfied all three definitions of a governmental function, while the Limings assert that the Society was not engaged in a governmental function at all. We agree with the trial court's conclusion that the Society was engaged in a governmental function when the Limings were allegedly harmed, but for different reasons.
The Society's argument that it was engaged in a governmental function because it was voluntarily performing a function imposed upon the state as an obligation of sovereignty is without merit. The state has no obligation by virtue of its sovereignty to conduct county fairs or to promote agriculture through organized competitions, as it does to provide other functions such as formal education and law enforcement. Thus, the Society was not engaged in a governmental function pursuant to R.C.2744.01(C) (1) (a).
The trial court's view that the Society was engaged in a function that was for the common good of all citizens of the state pursuant to R.C.2744.01(C) (1) (b) presents a more difficult question. The trial court concluded that the Greene County Fair benefits all citizens of the state by promoting agriculture because agriculture is a vital industry in Ohio and that the Fair affected agricultural interests outside of Greene County because representatives of the Greene County Fair attend the Ohio State Fair. Although we agree with the trial court that "a function need not directly affect all citizens of the state" in order to qualify as a governmental function pursuant to R.C. 2744.01(C) (1) (b), we are inclined to agree with the Limings that the trial court's definition of what "is for the common good of all citizens of the state" sweeps too broadly. One reason for our concern is that a broad reading of what is for the common good of all citizens seems to subsume the definition of a governmental function set forth in R.C. 2744.01(C) (1) (c), which provides that a governmental function is one that promotes or preserves the public peace, health, safety, or welfare and is not engaged in or not customarily engaged in by nongovernmental persons. Any activity that promotes or preserves the public peace, health, safety, and welfare would also fall within a broad definition of what is for the common good of all citizens of the state, thus obscuring the legislature's purpose in crafting a distinction between activities engaged in or customarily engaged in by nongovernment persons and those that are not. See R.C. 2744.01(C) (1) (c) and (G) (1) (b). Further, although there is some authority supporting the trial court's broad interpretation of what is for the common good of all citizens, there is at least one case from our district that does not support such a broad reading. See Smith v. Cleveland (Apr. 27, 1995), Cuyahoga App. No. 67543, unreported (school crossing guards benefit all citizens of the state because all citizens have an interest in the safety of children). But, see, Parker v.Dayton Metro. Housing Auth. (May 31, 1996), Montgomery App. No. 15556, unreported (public housing benefits only those who use it and involves an activity — rental of residential premises — customarily engaged in by nongovernmental persons).
Fortunately, we need not determine the scope of R.C. 2744.01(C) (1) (b) because, in our view, the Society's sponsorship of the livestock competitions at the county fair falls within the definition of a governmental function as set forth in R.C. 2744.01(C) (1) (c). The county fair promotes the public welfare insofar as it educates the public about agriculture, horticulture, livestock, home economics, and art, and it does so through activities that are not engaged in or not customarily engaged in by nongovernmental persons, such as livestock competitions. Accordingly, we find that the Society was engaged in a governmental function when it allegedly harmed the Limings.[1]
Having found that the Society was a political subdivision engaged in a governmental function, the final issue for our consideration is the Limings' allegation that Mangan can be held personally liable because he acted with malice, in bad faith, or recklessly in the execution of his duties, as provided in R.C. 2744.03(A) (6) (b). According to the Limings, the conduct giving rise to this claim was Mangan's failure to consider certain evidence tending to show that the hogs in question were different animals, his failure to follow established procedures in investigating the incident, and his reporting of the Society's sanctions to the Xenia Daily Gazette. The trial court found that, while Mangan's conduct may have been negligent, "reasonable minds cannot differ that [it] did not rise to the level of and constitute malice, bad faith, or reckless conduct."
Although there is a genuine issue of material fact as to whether Mangan employed the appropriate procedures in investigating his suspicions about the Limings' hog, there is no evidence that Mangan acted with ill will, malice, or in bad faith in deviating from the Society's established procedures. The alleged deviation from the Society's procedures does not, in and of itself, show malice or bad faith. Further, we agree with the trial court's conclusion that reasonable minds could not differ on whether Mangan had acted recklessly. It is undisputed that Mangan's notes about the investigation reflected conversations with numerous persons with knowledge of the hog entered in each fair, that Mangan gathered videotapes of the hog entered in each fair, and that he obtained three expert opinions that the hog entered in each of the two fairs was the same hog before the Society considered the issue of sanctions. Although we express no opinion about whether Big Fat was the hog shown at the Clinton County Fair, there was evidence that Mangan had carefully investigated his suspicions and from which Mangan could have reasonably concluded that the hog entered in each fair was one and the same. As such, reasonable minds could not have differed as to whether Mangan had acted recklessly in his investigation of the matter, and he was not stripped of his immunity pursuant to R.C.2744.03(A) (6) (b). Additionally, there was no genuine issue of material fact that any comments Mangan made to the Xenia Daily Gazette by way of explaining the Society's sanctions against the Limings were made outside the scope of his employment or with ill will or malice.
Because the trial court did not err in granting summary judgment in favor of the Society and Mangan on their immunity from tort liability, the third assignment of error is overruled.
The judgment of the trial court will be affirmed.
BROGAN, J. and FAIN, J., concur.
Copies mailed to:
Neil F. Freund
Lynnette Pisone Ballato
Lester L. Ferguson
David M. Deustch
Hon. Richard E. Parrott
(by assignment)
[1] We do not reach the issue of whether the Society would be treated as having engaged in a governmental function for harm incurred by participants in some of the fair's more "proprietary" functions, such as carnival rides and musical entertainment.