OPINION
Plaintiff-appellant Cindy Alcorn appeals from a judgment of the Montgomery County Common Pleas Court granting a directed verdict in favor of defendants-appellees Auto Systems Centers, Inc. (d.b.a. Midas) and Randall ("Randy") Lindquist on her sex discrimination claim.[1] She contends that her prima facie case of sex discrimination coupled with evidence of pretext precluded the trial court from granting judgment as a matter of law to Midas under Civ.R. 50 and Reeves v. Sanderson PlumbingProd., Inc. (2000), 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105. We disagree. Accordingly, the judgment of the trial court is Affirmed.
 I
Alcorn sued Midas for sex discrimination in 1999. She claimed that Midas demoted her from the position of assistant manager to customer service representative ("CSR") because of her gender. Midas unsuccessfully moved for summary judgment on Alcorn's discrimination claim, which the court denied because "there appear to be material issues of fact relating to the question of discrimination." Dec. 20, 2000, Decision, Order and Entry Overruling Defendants' Motion for Summary Judgment Filed Oct. 25, 2000.
The case was tried to a jury on April 23 and 24, 2001. Midas moved for a directed verdict at the close of Alcorn's case-in-chief, which the court denied. Midas then attempted to show that Alcorn was demoted to CSR for economic reasons. Primarily, the Springfield store was failing, and the company could not afford to pay assistant managers an hourly wage if they could not work on automobiles as well as perform management duties (i.e., the store could not afford to pay an individual an hourly rate if they could not perform repairs to cars). Additionally, the Huber Heights store needed and could support a CSR. Alcorn, in turn, tried to demonstrate that this explanation was pretext for gender discrimination.
The evidence presented shows that Alcorn began working for Midas in Huber Heights as a CSR in 1997. She was promoted to assistant manager at the Springfield store in 1998. Midas employed other female assistant managers in the East Dayton market during this period. Rob Lawless was the district supervisor of these stores. In 1998, Lindquist became regional director of all Dayton stores. Lawless testified that Lindquist told him that one of the drawbacks of his management style was that "you got girls as Assistant Managers." T. 24. Lindquist did not recall making the statement. Both sides agree that at that time the Dayton region, especially the Springfield store, was financially troubled.
Alcorn was demoted from assistant manager and transferred to the Huber Heights store as a CSR three months after Lindquist's alleged statement to Lawless. She was replaced by a man. Other female assistant mangers, who like Alcorn were unable to perform work on automobiles, in the East Dayton market were also demoted, or otherwise lost or left their positions. Lindquist testified that each of these individuals, like Alcorn, worked at low volume stores and could not do productive work,i.e., work on automobiles. Thus, the stores could not justify paying their salaries. Further, Midas employs a small number of female managers and assistant managers who can perform repairs to automobiles.
During this time, Lawless was also demoted from district supervisor to manager. He was replaced by Jeff Hammond. Hammond hired a female CSR, Tracey McFarland, who also did not work on cars, at the Springfield store shortly after Alcorn's transfer. She was terminated by Lindquist two months later. Lindquist testified that Hammond's hiring of McFarland was a mistake because Hammond, who was not from the Ohio market area, was unaware of the necessity of reducing payroll at the Springfield store:
 Q. [Alcorn's counsel] How'd [payroll] go down if you — if you hired in a — a C.S.R to take [Alcorn's] place?
 A. [Lindquist] I believe Mr. Hammond — Jeff Hammond, when he came in, he hired a, uh . . . C.S.R.
Q. Okay.
 A. I was not aware of it. And as — as your Witness has stated, when I became aware of it I came to the store and I had to be the one to let her go because we could not afford it.
 Q. So you're saying that — that — that you made the decision to move, uh . . . — to — to, uh . . . what I — what I consider to demote Cindy Alcorn, uh . . . and — and — and Hammond wasn't — wasn't involved in that discussion?
 A. Jeff Hammond wasn't, uh . . . on the job at that time. Jeff Hammond came in I think a month later or a month-and-a half, possibly two months afterwards.
* * *
 Q. But by the time Hammond came, did you have a chance to talk with him? I mean, did — did he know you didn't want `im to hire a, uh . . ., uh . . ., uh . . . another, uh . . ., uh . . . C.S.R.?
 A. I'm not sure if I covered that with him or not, Mr. Brezine, but we were runnin' an entire city that was, uh . . . — the whole city was trouble.
 Q. But wasn't that, uh . . ., uh . . . kinda like part of your whole rationale to — to — to — to — to demote Cindy Alcorn, so you could save money? Wouldn't Hammond have learned that from you?
 A. I woulda hoped he would, but people do make, ya' know, uh . . . — whether he heard it or if he — he made the mistake in — in putting somebody in there, uh . . . I think Mrs. McFarland — Tracey McFarland who was the C.S.R., had moved over from the Bechtel Avenue store. And I don't know how many hours she put in there, whether she was full time or part time or what. Either way, we couldn't afford it.
T. 275-77.
This testimony was controverted by Jason Barney, manager of the Springfield store during Alcorn's demotion and subsequent hiring of Tracey McFarland:
 Q. [Alcorn's counsel]: Uh . . . how did you became [sic] aware that — that, uh . . . — or — or — or did you at some point become aware that, uh . . . you were gonna lose Cindy as your, uh . . . assistant manager?
 A. [Barney] * * * They pulled her out. We talked it over, as far as me, Rob Lawless and Jeff Hammond, to move `er back to Huber Heights `cause Huber needed a secretary. They felt that I didn't need one. She was occupying two positions at the same time and they wanted pretty much to eliminate one of `em, so I hired another secretary in after I left her down and that's — I hired one of my guys that were already there. I made him the assistant manager.
 Q. So, after she left, you still had a — you still had to have a C.S.R.?
A. Yes.
Q. Full time?
A. Yes.
Q. Uh . . . whose decision was that?
 A. That was Jeff Hammond's and whoever told him they wanted to move `em around. He was the supervisor of our six stores.
* * *
 Q. How did you find out [that you were losing Alcorn as an Assistant Manager]?
A. Uh . . . by Jeff Hammond.
Q. Jeff Hammond told you? What'd he tell you?
 A. He told me that they were going to pull her out, swap her into Huber Heights and then work with my store later as far as gettin' another one in there.
T. 60-61.
At the close of all of the evidence, Midas again moved for directed verdict. After weighing the evidence of discrimination against other circumstances surrounding Alcorn's demotion, the court granted Midas' motion upon the ground that Alcorn had failed to show that Midas' reason for her demotion was pretextual. The trial court rendered judgment accordingly. From the judgment rendered against her, Alcorn appeals.
 II
Alcorn raises four assignments of error:
 IT IS ERROR TO FIND NO DIRECT EVIDENCE OF DISCRIMINATORY INTENT WHERE DEFENDANT, WHILE LISTING TO AN INTERMEDIATE MANAGER NEGATIVES THAT NEEDED ATTENTION STATES, "ROB, YOU GOT GIRLS AS ASSISTANT MANAGERS" AND TESTIMONY SHOWS THAT ALL THREE SUCH "GIRLS," INCLUDING THE PLAINTIFF WERE GONE AS ASSISTANT MANAGERS WITHIN THREE MONTHS
 IT IS ERROR TO DIRECT A VERDICT AGAINST A FEMALE EMPLOYEE DEMOTED FROM HER ASSISTANT MANAGER POSITION BASED ON A CLAIM BY DEFENDANT THAT SHE (ALONG WITH 2 OTHER FEMALE ASSISTANT MANAGERS) NEVER REALLY WAS AN ASSISTANT MANAGER WHERE THE DEFENDANT CORPORATION'S OWN PERSONNEL ACTION CALLS IT A DEMOTION FROM ASSISTANT MANAGER TO CUSTOMER SERVICE REPRESENTATIVE AND WHERE THE JUDGE BASES HIS RULING ON A FINDING THAT "IT APPEARS THAT THE TITLE GIVEN AS ASSISTANT MANAGER WAS GRATUITOUS" WEIGHING FAVORABLY THE TESTIMONY OF DEFENDANT LINDQUIST TO THE EFFECT THAT PLAINTIFF NEVER REALLY WAS AN ASSISTANT MANAGER, WHICH TESTIMONY NOT ONLY IS NOT SUCH AS A JURY IS REQUIRED TO BELIEVE, BUT WHICH IS CONTRADICTED BY DEFENDANT CORPORATION'S OWN DOCUMENT AND BY ALL OTHER DEFENDANT WITNESSES WHO ADDRESSED THE ISSUE
 IT IS ERROR TO GRANT A DIRECTED VERDICT ON DEFENDANTS' LIABILITY FOR SEX DISCRIMINATION IN DEMOTING PLAINTIFF ON THE BASIS THAT DEFENDANTS INTRODUCES [SIC] AN ALLEGED LEGITIMATE BUSINESS REASON AND THE COURT FINDS "IT MAY BE THAT THERE'S NO PRETEXT SHOWN"
 IT IS ERROR TO DIRECT A VERDICT IN FAVOR OF DEFENDANTS ON THE ISSUE OF PUNITIVE DAMAGES BASED ENTIRELY ON A FINDING THAT PLAINTIFF'S TESTIMONY DID NOT PRESENT HER SUFFERING "REAL DISTRESS," OR "HUMILIATION" OR "MENTAL DISTRESS" OR "GREAT DISTRESS" WHERE THE TESTIMONY AT TRIAL DID INDEED PRESENT EVIDENCE OF SUCH SUFFERING AND WHERE, MORE IMPORTANTLY, THE COURT IN RULING ON PUNITIVE DAMAGES MAKES NO REFERENCE TO THE EVIDENCE AT TRIAL OF THE ACTUAL MALICE DISPLAYED BY THE DEFENDANTS AND OF DEFENDANTS' WANTON AND WILLFUL DISREGARD FOR THE RIGHTS OF PLAINTIFF TO BE TREATED EQUALLY WITH MALE EMPLOYEES
Essentially, Alcorn challenges the trial court's granting of Midas's motion for a directed verdict on her discrimination claim. Accordingly, we address her assignments of error together.
We are mindful that we must conduct a de novo review of the entire record to determine if the trial court's grant of a directed verdict is appropriate in this case. Schafer v. RMS Realty (2000), 138 Ohio App.3d 244,258. As with motions for summary judgment, we must construe the evidence most strongly in favor of Alcorn and determine whether "upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to [her]."Wagner v. Midwestern Indemn. Co. (1998), 83 Ohio St.3d 287, 294 (quoting Civ.R. 50). We neither weigh the evidence nor determine the credibility of witnesses. Id. "[I]f there is substantial competent evidence to support [Alcorn's claim], upon which evidence reasonable minds might reach different conclusions[,]" then we will reverse the trial court's judgment. Cater v. Cleveland (1998), 83 Ohio St.3d 24, 33 (internal citations omitted). We are also guided by the Supreme Court's recent suggestion in Reeves, supra, that:
 [A]n employer would be entitled to a judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. . . . To hold otherwise would be effectively to insulate an entire category of employment discrimination from review under Rule 50, and we have reiterated that trial courts should not "treat discrimination differently from other ultimate questions of fact."
Ohio courts rely upon federal case law construing Title VII to resolve gender discrimination claims brought under R.C. Chapter 4112. Plumbers Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm. (1981), 66 Ohio St.2d 192. The following test applies when analyzing if an individual is the victim of gender discrimination:
 First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. The McDonnell Douglas division of intermediate evidentiary burdens serves to bring the litigation and the court expeditiously and fairly to this ultimate question.
Texas Dept. of Comm. Affairs v. Burdine (1981), 450 U.S. 248, 252-53,101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (internal citations omitted).
Midas concedes that Alcorn established a prima facie case of employment discrimination. Thus, the burden shifted to Midas "to articulate some legitimate, nondiscriminatory reason" for Alcorn's demotion. Id. "This burden is one of production not persuasion; it `can involve no credibility assessment.'" Reeves, supra (internal citation omitted). Midas met this burden by offering admissible evidence that Alcorn was demoted because the Springfield store could not afford to pay wages to assistant managers who could not work on cars and that Huber Heights needed a CSR. Thus, the controversy in this case centers around whether Alcorn "prove[d] by a preponderance of the evidence that the legitimate reasons offered by [Midas] were not its true reasons, but were a pretext for discrimination." Texas Dept. of Comm. Affairs, supra.
Both parties appear to agree that Reeves, supra, governs the outcome in this case. In that case, Reeves, a 57-year-old man, sued his employer, Sanderson Plumbing Company, for terminating him because of his age. Id. At trial, the company put forth evidence that it decided to terminate Reeves because of his failure to maintain accurate employee attendance records. Id. Reeves attempted to show that the company's reason was pretextual by introducing evidence that he accurately recorded employee attendance and that his supervisor had demonstrated age-based animus against him in their dealings together. Id. This evidence consisted of testimony by both Reeves and the company's witnesses that the time clock sometimes failed to record employee hours and so managers, like Reeves, would make notations on an employee's time card that they reported to work on time. Id. Additionally, Reeves showed that, on the day he was fired, the company told him that he was being terminated because he failed to report the absence of one employee. Id. However, on the day of that employee's absence, Reeves was in the hospital. Id. Reeves also presented evidence that his supervisor had made statements that Reeves "was so old [he] must have come over on the Mayflower" and he "was too damn old to do [his] job." Id. The company moved for directed verdict, which the trial court denied. Id. The appellate court reversed and entered a directed verdict on behalf of the company. Id. On review, the United States Supreme Court held that Reeves' prima facie case, coupled with sufficient evidence of pretext, precluded a directed verdict for the company. Id.
Applying Reeves, we conclude that, while it is a close call, Midas was entitled to judgment as a matter of law. Although Alcorn established aprima facie case, she failed to make more than a weak showing of the falsity of Midas' proffered reason for her demotion — that the company was trying to save money by not having assistant managers who could not perform the directly income-producing work of repairing vehicles. The evidence she produced regarding Lindquist's statement to Lawless and Hammond's hiring and subsequent firing of a CSR in the Springfield store is not enough to avoid a directed verdict in light of testimony by both Alcorn and Midas' witnesses that the Springfield store was failing; payroll was incredibly high at this store; and ultimately it was closed because it could not turn a profit. Furthermore, the evidence demonstrated that Midas does employ female managers and assistant managers. The key difference between these females and those who no longer work at Midas in that capacity is that the female managers and assistant managers kept on in those positions are able to perform repairs to vehicles. While we agree with Alcorn that the company cannot legally discriminate against her based on her gender, it may make employment decisions based upon her qualifications. Thus, we conclude that Alcorn failed to present substantial, competent evidence to support her discrimination claim upon which reasonable minds might reach different conclusions. Alcorn could have defeated Midas' motion if she had presented evidence that the company continued to employ male managers or assistant managers who could not work on cars. Alternatively, she might have avoided a directed verdict by offering statistical evidence (assuming it exists) regarding Midas' negative employment practices toward women. See Gliner v. Saint-Gobain Norton Indus. Ceramics Corp. (2000), 89 Ohio St.3d 414. But she did neither; thus, Midas was entitled to a directed verdict on her gender discrimination claim.
Based on the foregoing analysis, the trial court also properly granted a directed verdict to Midas on Alcorn's claim for punitive damages, because she failed to prove that she suffered actual damages. Cabe v.Lunich (1994), 70 Ohio St.3d 598, 601. ("Punitive damages may not be awarded in Ohio absent proof of actual damages.") Accordingly, Alcorn's assignments of error are overruled.
 III
All of Alcorn's assignments of error having been overruled, the judgment of the trial court is Affirmed.
BROGAN and WALTERS, JJ., concur.
(Honorable Sumner E. Walters, of the Court of Appeals, Third Appellate District, Sitting by Assignment of the Chief Justice of the Supreme Court of Ohio).
[1] For the sake of judicial economy, defendants-appellees will be referred to as Midas throughout the course of this opinion.