NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0544n.06
Filed: June 23, 2005

Case No. 04-3085

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| STEPHEN STERN; DIANE STERN, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| CITY OF STEUBENVILLE, Department | ) | DISTRICT OF OHIO |
| of Law, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE: SILER, BATCHELDER and DAUGHTREY, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.** Plaintiffs-Appellants Stephen and Diane Stern

appeal from the district court's order in this diversity action granting summary judgment in favor

of Defendant-Appellee City of Steubenville ("Steubenville"). Because we conclude that there are

genuine issues of material fact remaining for trial, we REVERSE the judgment of the district court.

**I.**

Steubenville has been responsible for maintaining Lovers Lane Extension since its

construction in 1991. Lovers Lane Extension is a heavily traveled four-lane road that acts as a

connector to the county road system and to United States Route 22. While Lovers Lane Extension

is paved in asphalt, the ramp to Route 22 is paved in cement. The cement ramp is approximately

one inch higher than the asphalt road, and there is a gap between the different pavements. David

Snelting, Steubenville's City Engineer, explained at his deposition that there would be natural

cracking between the surfaces because two different materials were used as paver. As a result, in 1995 Steubenville filled the gap with crack sealant, which is a rubberized asphalt material in liquid form that is poured into cracks to minimize water penetration. Snelting testified that Steubenville may have also sealed the gap between the road surfaces again a couple of years later, and he explained that crack sealant, if not applied properly, can come loose in a year, but that properly applied sealant could last for over ten years.

Because Lovers Lane Extension is a newer road it has never been resurfaced. Joseph DeSantis, Steubenville's Street Superintendent, stated at his deposition that his department performs a complete visual inspection of every street, including Lovers Lane Extension, at least once per year in the spring to determine if any areas need to be patched or sealed. These visual inspections are sometimes performed as frequently as once per week during the winter. DeSantis also stated that he and others in his department would have traveled over Lovers Lane Extension numerous times, and that his employees could have noticed any difference in elevation between the road surfaces.

Stephen Stern took up recreational cycling in the 1980's. He was an avid and experienced cyclist. Each cycling season, which lasted from approximately April until September, Stern would bike hundreds of miles and compete in various cycling competitions. He routinely took his bicycle in for maintenance each year, and he wore appropriate riding attire, including a helmet, bicycle gloves and shoes, bicycle pants, and bright colored clothing. While riding on roads, Stern tried to ride near the white line on the right edge of the road so that automobile traffic could easily pass him.

Stern testified during his deposition that he preferred riding on the county roads because they generally had less traffic, but that he used Lovers Lane Extension to access the county roads. He had ridden on Lovers Lane Extension approximately 25 to 30 times during the period of nine years

from 1991 to June 2000. During that time period, Stern said, he would frequently see other cyclists traveling on his routes. Cycling is permitted on Lovers Lane Extension, but is prohibited on Route 22 as evidenced by a sign posted along the entrance ramp to Route 22 prohibiting the use of bicycles on that roadway. The posted speed limit on Lovers Lane Extension is 50 mph.

On June 12, 2000, Stern was traveling down slope on Lovers Lane Extension at a speed of between 25-35 mph. It was a cloudy day, but the road conditions were dry. As Stern traveled north on Lovers Lane Extension past the eastbound entrance ramp to Route 22, his bicycle tires entered the gap between the pavements and became stuck. Stern does not remember seeing the crack in the roadway prior to his accident. Cheryl Mieczkowski, who was driving only a few car lengths behind Stern at the time of the accident, testified that Stern's bicycle tires became stuck in the gap between the asphalt and concrete pavements; that his bicycle began to shake; and that he was thrown over the handlebars. Stern landed with enough force that his bicycle helmet cracked on the right side where his head struck the ground.

Mieczkowski stated that as a frequent driver on Lovers Lane Extension she had been aware of the gap between the road and the ramp for at least one year prior to the accident. Christopher Becker, another cyclist and a former co-worker of Stern's, stated that he had ridden his bicycle on Lovers Lane Extension approximately a half a dozen times prior to the accident, and that he noticed the gap in either 1998 or 1999. Becker also said that the gap existed down the entire seam where the roads abut; that the gap was generally 1 ½ to 2 inches in width, but was 6 to 8 inches wide in some places where asphalt or cement had worn or chipped away; and that the average depth of the gap was about 2 ½ to 3 inches. On one occasion, Becker purposefully avoided the gap in the road for fear that his tires would become stuck in it. Becker had seen other cyclists traveling on Lovers

3

Lane Extension while he was riding on that road, but only infrequently. There is no evidence in the record that Steubenville received any complaints concerning the crack, and there were no reports prior to Stern's accident of any accidents involving bicycles or motor vehicles caused by this gap between pavements.

Following the accident, Stern was treated for a number of broken ribs, a broken clavicle, a broken scapula, and a closed head injury. He currently suffers from cognitive loss, as well as anxiety and depression as a result of his brain injury. At the time of the accident, Stern was running for re-election as the chief prosecuting attorney in Jefferson County, Ohio, but he was unable to return to work full time. Colleagues stated that following the accident, Stern had trouble concentrating and remembering details, which prevented him from performing at the level at which he had performed prior to the accident. He eventually lost his bid for re-election, and has since been deemed totally disabled by all four of his treating physicians and two independent medical examiners retained by the State of Ohio.

On June 4, 2002, Stern filed this diversity action in the district court alleging, in relevant part, that Steubenville was liable in negligence for failing to keep its roads open, in repair and free from nuisance as required by the Political Subdivision Tort Liability Act, R.C. § 2744 *et seq.* Stern's wife, Diane Stern, also brought a claim for loss of consortium as a result of her husband's injuries. Shortly thereafter, Steubenville moved for summary judgment. On December 9, 2003, the district court granted Steubenville's motion for summary judgment, concluding that Stern could not overcome the general immunity from suit enjoyed by Steubenville under Ohio law because he could not demonstrate a genuine issue of material fact with regard to whether the condition on Lovers Lane Extension constituted a nuisance. Specifically, the district court found that the crack in the

4

road, which the court found measured only 6 inches long, 3 inches wide, and 2 inches deep, represented only a minor defect that was insufficient as a matter of law to constitute a nuisance, and that Stern had presented insufficient evidence to demonstrate that Steubenville's employees should have been aware that the condition on Lovers Lane Extension represented a danger to bicyclists. This appeal followed.

## II.

We review a district court's grant of summary judgment *de novo*, using the same standard under Rule 56(c) used by the district court, *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc), and we consider the record as it stood before the district court at the time of its ruling. *Niecko v. Emro Marketing Co.,* 973 F.2d 1296, 1303 (6th Cir. 1992). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). We view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Entry of summary judgment is appropriate only "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Because this action is premised on diversity jurisdiction, we are bound to apply Ohio's substantive law as declared by the state legislature in a statute or by the state's highest court. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78-79 (1938). Ohio law establishes a three-tiered analysis for determining whether a political subdivision is immune from liability for harm flowing from

5

dangerous conditions on public ways. Under Ohio law, a political subdivision is generally not liable in damages in a civil action for injury, death, or loss to persons or property incurred in connection with the performance of a governmental or proprietary function. R.C. § 2744.02(A)(1). Because a municipality constitutes a political subdivision, R.C. § 2744.01(F), and the maintenance and repair of roads and highways is a governmental function, R.C. § 2744.01(C)(2)(e), Steubenville is generally entitled to immunity. There are, however, several exceptions to municipal immunity. *See* R.C. § 2744.02(B). Particularly, former R.C. § 2744.02(B)(3) provided that "political subdivisions are liable for injury, death, or loss to persons or property caused by their failure to keep public roads, highways, [and] streets . . . within the political subdivisions open, in repair, *and free from nuisance*."[1] (Emphasis added). Once an exception to immunity is found to apply, the political subdivision will be entitled to immunity only if it can establish one of the defenses found in R.C. § 2744.03. The focus of this appeal is whether Stern has presented genuine issues of material fact sufficient to establish the "nuisance" exception contained in former R.C. § 2744.02(B)(3).

The Ohio Supreme Court used a two-pronged test to determine whether a condition in a public road constituted a nuisance for purposes of former R.C. § 2744.02(B)(3). To withstand a motion for summary judgment, Stern must first establish that the condition existing within the political subdivision's control alleged to constitute a nuisance "creates a danger for ordinary traffic on the regularly traveled portion of the road," and "that the cause of the condition was other than a decision regarding design and construction." *Haynes v. City of Franklin*, 767 N.E.2d 1146, 1151 (Ohio 2002). "Classic examples of nuisances include a malfunctioning traffic light, a pothole in the

---

[1]The language in former R.C. § 2744.02(B)(3) requiring political subdivisions to keep public roadways "free from nuisance" was deleted when the statute was amended by 2002 Ohio Laws File 239 (S.B. 106), eff. 4-9-03. Because the operative facts of this case predated the effective date of the amendment, it is the pre-amended statute that is applicable here. *See Harp v. City of Cleveland Heights*, 721 N.E.2d 1020, 1023 n. 1 (Ohio 2000).

roadway, or an overhanging tree limb." *Cater v. City of Cleveland*, 697 N.E.2d 610, 616 (Ohio 1998). If the condition complained of is determined to be a nuisance, it must also be shown that the political subdivision had either actual or constructive knowledge of the nuisance before liability can be imposed. *Harp*, 721 N.E.2d at 1025. Whether a condition in the road is a nuisance and whether a political subdivision is liable for injuries caused by that nuisance are generally questions of fact to be determined by the jury. *See Haynes*, 767 N.E.2d at 1151-52; *see also Dickerhoof v. City of Canton*, 451 N.E.2d 1193, 1196 (Ohio 1983).

Because neither party addressed whether the gap between Lovers Lane Extension and the entrance ramp to Route 22 was the result of a decision regarding design and construction, the dispute in the district court centered on whether that gap constituted a nuisance by creating "a danger for ordinary traffic on the regularly traveled portion of the road." *Haynes*, 767 N.E.2d at 1151. Ohio law clearly contemplates that bicycle traffic may sometimes represent "ordinary traffic" on a public road. R.C. § 4511.52 generally states that traffic laws apply to bicycles "whenever a bicycle is operated upon any highway," and R.C. § 4511.55 sets forth specific rules to be followed by bicyclists riding "upon a roadway." Ohio courts have also concluded that the prohibition against maintaining a nuisance in a public roadway extends to bicycle traffic. *See Kercher v. City of Conneaut*, 65 N.E.2d 272, 280 (Ohio App. 7th Dist. 1945). In his affidavit, DeSantis specifically averred that bicycles are permitted on Lovers Lane Extension, and both Stern and Becker stated that they had seen other cyclists riding on that road. We therefore find that the district court correctly concluded that the evidence is sufficient to raise a genuine issue of fact as to whether bicycles constituted "ordinary traffic" on Lovers Lane Extension such that Steubenville owed a duty toward bicyclists to keep the road free from nuisances.

7

Contrary to the district court's conclusion, however, there also remain genuine issues of fact as to whether the crack between the road surfaces represented a "danger" to bicyclists. The district court found that the precise location in which Stern's tire became lodged was "measured by the accident investigators as being six inches long, three inches wide, and two inches deep." The district court then analogized this case to *Kimball v. City of Cincinnati*, in which the Supreme Court of Ohio held that a municipality is not liable as a matter of law for variations of from one-half to three-fourths of an inch in elevation between adjacent sections of the sidewalk which are "minor defects" and too insignificant to constitute a nuisance. 116 N.E.2d 708, 708, 710 (Ohio 1953); *see also Cash v. City of Cincinnati*, 421 N.E.2d 1275, 1277 (Ohio 1981) (explaining that case law following *Kimball* extended the *Kimball* holding to one-half of an inch to two inch variations). Relying on *Kimball*, the district court found that the "crack at issue in this case was a minor defect located in a seam between two road surfaces." The court opined that such a minor defect could not represent a danger to ordinary traffic, and that Stern was the victim of a freak accident caused by his bicycle "hitting a narrow gap between two pavements at just the right angle and speed to lose control."

It is questionable whether the holding in *Kimball*, a sidewalk defect case pertaining to pedestrians, is applicable under the circumstances presented here. The Supreme Court of Ohio has even suggested that, despite the holding in *Kimball* and its progeny, a political subdivision's liability for sidewalk defects is more properly determined by analyzing the particular facts and the attendant circumstances of each case. *See Cash*, 421 N.E.2d at 1278. And we are convinced that when analyzing whether a condition in a *roadway* is a nuisance within the meaning of former R.C. § 2744.02(B)(3), "the focus should be on whether a condition exists . . . that creates a danger for ordinary traffic on the regularly travelled portion of the road," and not necessarily on the dimensions

8

of the condition alleged to be a nuisance although such evidence is relevant to the analysis. *Manufacturer's Natl. Bank of Detroit v. Erie Cty. Road Comm.*, 587 N.E.2d 819, 823 (Ohio 1992).

Bearing in mind the proper test, we find that there are genuine issues of material fact as to whether the road conditions on Lovers Lane Extension constituted a "danger" to bicyclists. First, the district court focused on only a small portion of the gap between the road surfaces. According to Stern and Mieczkowski, *both* of Stern's tires became stuck in the gap causing him to lose control of his bicycle. Stern's and Mieczkowski's claims that both bicycle tires became trapped in the seam are inconsistent with the district court's finding that the precise location in which Stern's *tire* became lodged measured only 6 inches long, 3 inches wide, and 2 inches deep. The district court also ignored Becker's testimony that the gap existed down the entire seam where the roads abut, at least 15-20 feet, and that the gap was generally 1 ½ to 2 inches in width, but was 6 to 8 inches wide in some places where asphalt or cement had worn or chipped away, and had an average depth of about 2 ½ to 3 inches. Certain photographs in the record appear to support Becker's testimony that the cracking was more extensive than the district court found it to be.

Second, the district court did not properly consider the danger which the road conditions on Lovers Lane Extension could potentially cause to bicyclists. Stern testified that while riding on roads he routinely tried to ride to the left of the white line on the right side of the road as he was required to do under R.C. § 4511.55(A). The photographs in the record clearly show that the gap that abuts Lover Lane Extension and Route 22 runs straight down the line where bicyclists are required to ride. In fact, Stern explained that he was traveling down a hill at a speed of between 25-35 mph passed a merge style entrance ramp where a car could simultaneously pass a cyclist on both the right and the left, leaving little room to maneuver away from the gap. The precise location of

the crack in the roadway in this case could be viewed by a jury as increasing the danger to a bicyclist.

Viewing these facts in a light most favorable to Stern, and drawing all inferences in his favor, there remains a genuine issue of fact as to whether the crack that has developed between Lovers Lane Extension and Route 22 constituted a nuisance to bicyclists for which Steubenville should be held liable.

The analysis does not end here, however, because even if a public road has not been kept free from nuisance, it must also be demonstrated that Steubenville had either actual or constructive knowledge of the nuisance before liability can be imposed. *Harp*, 721 N.E.2d at 1025. There is no evidence that prior to Stern's accident Steubenville received any complaints concerning the crack or any reports of similar accidents on Lovers Lane Extension. The district court therefore correctly concluded that there was no triable issue as to whether Steubenville had actual notice of the condition. Consequently, the viability of Stern's claim depends on whether Steubenville had constructive notice of the alleged nuisance. To raise a genuine issue of material fact concerning constructive notice, Stern must establish that "such nuisance existed in such a manner that it could or should have been discovered, that it existed for a sufficient length of time to have been discovered, and that if it had been discovered it would have created a reasonable apprehension of a potential danger." *Id.* (quoting *Beebe v. City of Toledo*, 151 N.E.2d 738, 741 (Ohio 1958)).

First, there is sufficient evidence from which a jury could conclude that Steubenville could have discovered the alleged nuisance. Snelting testified at his deposition that there is bound to be natural cracking between road surfaces where two different materials such as asphalt and cement are used as paver. And Steubenville officials knew of the problem at some point because the city

10

filled the gap with crack sealant in 1995. There is also evidence in the record that the city's initial attempt to seal the gap may not have been entirely successful, as Snelting testified that he thought the seam between the roads may have been crack sealed again a couple of years prior to Stern's accident. Additionally, DeSantis, Steubenville's Street Superintendent, testified at his deposition that his department performs a complete visual inspection of every street, including Lovers Lane Extension, at least once per year in the spring to determine if any areas need to be patched or sealed. These visual inspections are sometimes performed as frequently as once per week during the winter. DeSantis stated that he and others in his department would have traveled over Lovers Lane Extension numerous times, and he specifically said that any difference in elevation between the road surfaces could have been observed by his employees.

Second, there is sufficient evidence from which a jury could conclude that the gap had existed for a sufficient length of time to have been discovered. Becker testified that he first noticed the gap in either 1998 or 1999 while riding his bicycle on Lovers Lane Extension, and that the gap was obvious enough then that he had avoided it for fear that his tires might become stuck. Mieczkowski stated in her affidavit that as a frequent driver on the Lovers Lane Extension, she was aware of the gap between the asphalt road and the cement entrance ramp for at least one year prior to Stern's accident. The district court disregarded this evidence because no one had ever complained to city authorities concerning the crack. But complaints of defective road conditions constitute direct notice of a nuisance that goes to actual rather than constructive notice, and so the absence of any complaints is not dispositive of the constructive notice analysis. *See In re Fahle's Estate*, 105 N.E.2d 429, 431 (Ohio App. 6th Dist. 1950).

11

Finally, there is also sufficient evidence from which a jury could conclude that had the condition on Lovers Lane Extension been discovered it would have created a reasonable apprehension of potential danger to a bicyclist. The record makes clear that Steubenville personnel knew that bicyclists were permitted to ride on Lovers Lane Extension. While the district court found that even if it had been discovered, the crack was too small to have created a reasonable apprehension of danger to bicyclists, Stern presented testimonial and photographic evidence that the crack may have been larger than the district court found. Importantly, the photographs in the record show that the seam that abuts Lovers Lane Extension and Route 22 runs straight down the line where bicyclists are required to ride. Viewing these facts in the light most favorable to Stern, there is a genuine issue of fact as to whether Steubenville would have comprehended the danger this crack could cause to a bicyclist.

**III.**

We, of course, express no opinion as to the ultimate merits of this suit. But for the foregoing reasons, we hold that there remain genuine issues of material fact on which the Sterns are entitled to a trial. We therefore **REVERSE** the judgment of the district court and **REMAND** this case for further proceedings consistent with this opinion.

12