[This opinion has been published in *Ohio Official Reports* at 83 Ohio St.3d 24.]

CATER ET AL., APPELLANTS, *v.* CITY OF CLEVELAND, APPELLEE.

[Cite as *Cater v. Cleveland*, 1998-Ohio-421.]

*Municipal corporations—Tort liability—Operation of a municipal swimming pool is subject to the exceptions to immunity set forth in former R.C. 2744.02(B) and to the available defenses enumerated in R.C. 2744.03.*

The operation of a municipal swimming pool, although defined as a governmental function in R.C. 2744.01(C)(2)(u), is subject to the exceptions to immunity set forth in former R.C. 2744.02(B) and to the available defenses enumerated in R.C. 2744.03.

(Nos. 97-1261 and 97-1488—Submitted May 13, 1998–Decided August 19, 1998.)

APPEAL from and CERTIFIED by the Court of Appeals for Cuyahoga County, No. 70674.

─────────────

{¶ 1} On June 14, 1993, twelve-year-old Darrall A. Cater lost consciousness from nearly drowning in the city of Cleveland's Alexander Hamilton indoor swimming pool. As a result of the near drowning, Darrall developed acute bronchial pneumonia and was declared brain dead four days later. He died in the hospital after being removed from life support systems. Darrall's mother, Valerie Cater, as administrator of Darrall's estate, along with Darrall's father, Lawrence Cater, plaintiffs-appellants, brought this lawsuit against the city of Cleveland, defendant-appellee, alleging that the city acted negligently and/or recklessly in operating the swimming pool and causing Darrall's death. The city of Cleveland argued that it was immune from liability under R.C. Chapter 2744 and filed two motions for summary judgment. The trial court denied both of these motions, and the case proceeded to trial before a visiting judge.

{¶ 2} At trial, the evidence established that the near drowning occurred on the first day of the summer swim season at the Alexander Hamilton indoor swimming pool. On that day, there were four Red Cross certified lifeguards on duty. Lisa Hutson, a year-round physical director, was the senior guard. The other lifeguards on duty were Willie Hodge, who was also an experienced year-round physical director; Mark McDougall, who was hired as a summer lifeguard and had ten years' lifeguarding experience; and Damon Carter, who had recently been certified as a lifeguard in May 1993, and was beginning his first day as a lifeguard.

{¶ 3} Open swim was scheduled to take place from 1:00 to 4:30 p.m. From 1:00 p.m. until about shortly after 3:00 p.m., all four guards patrolled the pool. Hutson walked around the perimeter of the pool deck, while the other three guards were stationed at the lifeguard chairs, two of which were located at the deep end and one was located at the shallow end. At around 3:00 p.m., however, Hutson and Hodge left their posts, and took an unauthorized lunch break. Even though it was against pool policy to take lunch breaks during open swim periods, Hutson, who was nearly nine months pregnant, asked Hodge to buy them lunch. When Hodge returned around 3:30 p.m. with sandwiches, he and Hutson ate lunch in the lobby, while the other two guards remained at the pool. Rookie guard Carter sat in the high lifeguard chair at the deep end, while McDougall watched the shallow end of the pool from his guard chair. A folding chair that was located at the deep end, and which had previously been occupied by one of the other guards, was left empty.

{¶ 4} At approximately 3:40 p.m., swimmers notified McDougall and Carter that there was a boy at the bottom of the pool. The boy, later identified as Darrall Cater, was found at the bottom of the deep end, in seven feet of water, in an area within five to fifteen feet from the previously occupied folding guard chair. Carter explained that he had not seen Darrall in distress because glare interfered with his visibility. The glare was caused by sunlight that reflected off a glass-paneled wall that ran along the side of the pool, directly behind the high lifeguard

chair where Carter sat. City employees, including the aquatics manager for the city of Cleveland, were aware of the glare problem at the pool and conceded that there was no training on how to deal with the glare.

**{¶ 5}** Upon seeing Darrall at the bottom of the pool, McDougall dove in the water, pulled Darrall out of the pool and began CPR. Howard McKeller, the recreation center manager for the pool, who was responsible for all pool employees at that location, was returning to the facility when he heard the whistle blow. Upon hearing the whistle and seeing commotion, McKeller ran to the pool area and assisted McDougall with resuscitation attempts on Darrall.

**{¶ 6}** In the meantime, at least three city employees attempted to dial 911, but were unable to get an outside phone line. Carter said that he tried to dial 911 five or six times but could not get through. Physical director Hutson and a custodian made several attempts to dial 911, but they, too, did not know how to use the phone system. These employees were never instructed on the use of 911 and were never told that it was necessary first to dial a nine to get an outside line. When asked about the lack of training, center manager McKeller testified that he just assumed that the guards had been briefed how to get an outside line to dial 911. Eventually, someone was able to make the 911 call. However, paramedics did not arrive at the pool until about 4:10 p.m., nearly thirty minutes after Darrall's body was discovered at the bottom of the pool.

**{¶ 7}** One of Darrall's treating physicians at the hospital testified that Darrall had been deprived of oxygen for at least five minutes before resuscitation attempts were underway. According to the coroner, Darrall died as a result of the near drowning. Frank Pia, plaintiff's aquatics expert, testified that without proper oxygenation, irreversible brain damage occurs in a drowning within four to seven minutes. In Pia's expert opinion, the conduct of the physical directors and the failure to have in place an effective rescue plan, including the proper use of 911,

was reckless. Pia also testified that the glare spot in the pool created a nuisance; however, the trial court excluded that testimony.

{¶ 8} Following an internal investigation by the city, physical directors Hutson and Hodge, and the center's manager, McKeller, were found to have violated several city policies by failing to ensure that the pool was properly staffed at all times; wantonly or willfully neglecting the performance of their assigned duties; leaving the job or work area during regular working hours without authorization; failing to remain at their posts except in cases of emergency or when properly relieved; failing to maintain required standards of performance; and failing to observe official safety rules or common safety practices.[1] Due to their misconduct, Hutson and Hodge were each suspended for forty-five days. McKeller was suspended for three days.

{¶ 9} At the close of the plaintiffs' case, defense counsel moved for a directed verdict, again arguing that the city was immune from liability under R.C. Chapter 2744. Following oral arguments on this point, the trial court granted the

---

1. These individuals were cited for the following violations: leaving the job or work area during regular working hours without authorization (Hodge); neglect or carelessness in signing in or out (Hodge); recurrent failure to make required reports (Hutson); malicious mischief, horseplay, wrestling, or other undesirable conduct (Hutson); failing to show reasonable care in the use or operation of city property or equipment (Hutson); failing to observe department rules (Hodge, Hutson); unsatisfactory work or failure to maintain required standards of performance (McKeller, Hutson, Hodge); leaving post of continuous operations position prior to being relieved by employee or incoming shift (Hodge); threatening, intimidating, coercing, or interfering with supervisors or co-workers (Hutson); disregard or carelessness in observance of official safety rules, or disregarding of common safety practices (Hodge, Hutson); wanton or willful neglect in the performance of assigned duties in the care, use, or custody of any city property or equipment (Hodge, Hutson); refusal to work at the scheduled time for the scheduled shift (Hutson); failure to remain ready as a lifeguard (Hodge, Hutson); failing to remain at post except in cases of emergency or when properly relieved (Hodge, Hutson); failing to ensure that the pool is properly staffed at all times (Hodge, Hutson); failing to be responsible for and in charge of pool (Hutson); failing to see that all policies, rules, and regulations are enforced by staff (Hutson); failing to perform as a lifeguard (Hodge, Hutson); failing to establish the working schedule of staff (Hutson); failing to be responsible for the actions and work of all personnel assigned to facility (Hutson); leaving pool guard chair or pool deck without being properly relieved or dismissed (Hodge); failing to keep eyes on swimmers at all times (Hodge); and leaving pool unguarded unless in an emergency, and then only after clearing the pool (Hodge).

motion for directed verdict, noting that the city had hired qualified personnel, had proper rules and regulations in place, and did not act in a reckless or wanton manner.

{¶ 10} The court of appeals affirmed. In finding the city immune from liability under R.C. 2744.02(A), the court reasoned that the operation of an indoor municipal swimming pool is a governmental function under R.C. 2744.01(C)(2)(u), and that, therefore, no exceptions to immunity apply. Furthermore, the court held that the city did not act in a wanton or reckless manner in its discretionary decision making in the operation of the pool. See R.C. 2744.03(A)(5).

{¶ 11} This court accepted jurisdiction of this case in case No. 97-1261, upon the allowance of a discretionary appeal. The case was then certified to this court as being in conflict with *Hall v. Ft. Frye Local School Dist. Bd. of Edn.* (1996), 111 Ohio App.3d 690, 676 N.E.2d 1241, and *Siebenaler v. Montpelier* (1996), 113 Ohio App.3d 120, 680 N.E.2d 654, in case No. 97-1488, and is now before this court upon our determination that a conflict exists.

_____

*Linton & Hirshman* and *Robert F. Linton, Jr.; Klein & Carney Co., L.P.A.,* and *Larry S. Klein*, for appellants.

*Mark W. Ruf*, urging reversal for *amicus curiae*, Ohio Academy of Trial Lawyers.

*Isaac, Brant, Ledman & Teetor, Mark Landes* and *Steven G. LaForge,* urging affirmance for *amicus curiae*, County Commissioners Association of Ohio.

*John E. Gotherman* and *Daniel J. O'Loughlin*, urging affirmance for *amici curiae*, Ohio Municipal League and Ohio Municipal Attorneys Association.

*R. Todd Hunt*, urging affirmance for *amicus curiae*, Cuyahoga County Law Directors Association.

_____

**FRANCIS E. SWEENEY, SR., J.**

{¶ 12} The certified issue is "whether a governmental function and the absolute immunity provided it under R.C. 2744.01(C)(2)(u) [are] still subject to the exceptions to immunity provided in R.C. 2744.02(B)(3) and (4)." We find that the operation of an indoor municipal swimming pool, although defined as a governmental function under R.C. 2744.01(C)(2)(u), is still subject to the exception to immunity found in former R.C. 2744.02(B)(3), but not to the exception contained in former R.C. 2744.02(B)(4).

{¶ 13} We also find that a directed verdict was improper in this case, since reasonable minds can differ as to whether the city acted in a wanton or reckless manner under R.C. 2744.03(A)(5), by failing to institute policies or training regarding the use of 911.[2] Accordingly, we reverse the judgment of the court of appeals and remand the cause to the trial court for a new trial.

{¶ 14} The Political Subdivision Tort Liability Act, as codified in R.C. Chapter 2744, sets forth a three-tiered analysis for determining whether a political subdivision is immune from liability. First, R.C. 2744.02(A) sets forth the general rule of immunity, that political subdivisions are not liable in damages for the personal injuries or death of a person. R.C. 2744.02(A)(1) provides:

"For purposes of this chapter, the functions of political subdivisions are hereby classified as governmental functions and proprietary functions. *Except as provided in division (B) of this section,* a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." (Emphasis added.)

---

2. Appellants and *amicus curiae* Ohio Academy of Trial Lawyers also challenge the constitutionality of R.C. Chapter 2744. However, we need not address that issue based upon our disposition of the issues raised.

{¶ 15} The immunity afforded a political subdivision in R.C. 2744.02(A)(1) is not absolute, but is, by its express terms, subject to the five exceptions to immunity listed in former R.C. 2744.02(B). *Hill v. Urbana* (1997), 79 Ohio St.3d 130, 679 N.E.2d 1109. Thus, once immunity is established under R.C. 2744.02(A)(1), the second tier of analysis is whether any of the five exceptions to immunity in subsection (B) apply. Former R.C. 2744.02(B)(1) through (5). Finally, under the third tier of analysis, immunity can be reinstated if the political subdivision can successfully argue that one of the defenses contained in R.C. 2744.03 applies.

{¶ 16} Despite the structure of the Act, appellee, city of Cleveland, maintained below that it had absolute immunity in this case, and that it was not responsible for the negligent acts arising out of the operation of a municipal swimming pool. Since the General Assembly has already classified the operation of a municipal swimming pool as a governmental function under R.C. 2744.01(C)(2)(u), the city asserted that no consideration be given to the Act's exceptions. The court of appeals agreed with appellee and refused to apply the potential exceptions to immunity. The court reasoned that the statutory provisions conflict and that, pursuant to R.C. 1.51, the specific provision (R.C. 2744.01[C][2][u]) prevails over the general provisions (former R.C. 2744.02[B][3] and [4]), which are exceptions to the general grant of immunity.

{¶ 17} The court of appeals mistakenly relied on R.C. 1.51 to reach its result. R.C. 1.51 provides that if there are conflicting statutory provisions, effect should be given to both the general provision and special or local provision, if possible. Thus, under the cardinal rule of statutory construction, "all statutes which relate to the same general subject matter must be read *in pari materia*." *Johnson's Markets, Inc. v. New Carlisle Dept. of Health* (1991), 58 Ohio St.3d 28, 35, 567 N.E.2d 1018, 1025. In construing statutes together, this court must give full

application to both statutes unless they are irreconcilable and in hopeless conflict. *Id.*, citing *Couts v. Rose* (1950), 152 Ohio St. 458, 40 O.O. 482, 90 N.E.2d 139.

{¶ 18} R.C. 1.51 is inapplicable here because there is no conflict between R.C. 2744.01(C)(2)(u) and former R.C. 2744.02(B)(3) or (4). R.C. 2744.01(C) is simply a section of the Act that defines which activities are governmental and which are proprietary. In that context, a municipal swimming pool is included within the definition of governmental functions. The operation of a municipal swimming pool, although defined as a governmental function in R.C. 2744.01(C)(2)(u), is subject to the exceptions to immunity set forth in former R.C. 2744.02(B) and to the available defenses enumerated in R.C. 2744.03. Thus, the city's assertion that it has absolute immunity runs contrary to the express language of the Act. By structuring the Act in the manner that it did, the General Assembly clearly did not intend to immunize political subdivisions for all negligent actions that arise out of a governmental function. Rather than absolve a municipality from all responsibility, the General Assembly recognized that political subdivisions must be held accountable for some of their actions. This case exemplifies one such situation.

{¶ 19} Therefore, we agree with those appellate decisions certified as being in conflict with this case that have held that even if an activity is defined as a governmental function, it is still subject to the five exceptions of former R.C. 2744.02(B)(1) through (5). See *Siebenaler v. Montpelier* (1996), 113 Ohio App.3d 120, 680 N.E.2d 654; *Hall v. Ft. Frye Local School Dist. Bd. of Edn.* (1996), 111 Ohio App.3d 690, 676 N.E.2d 1241.[3]

---

3. The current version of R.C. 2744.02(B)(3), effective June 30, 1997, omits any reference to nuisance, and no longer refers to "public grounds." The newly enacted version of R.C. 2744.02(B)(4) is now applicable only to negligence that occurs within or on the grounds of "and is *due to physical defects* within or on the grounds of, buildings used in connection with the performance of a governmental function * * *." (Emphasis added.)

**{¶ 20}** In this case, appellants argue that two exceptions to immunity apply, former R.C. 2744.02(B)(3) and (B)(4). Former R.C. 2744.02(B)(3) provided:

"Political subdivisions are liable for injury, death, or loss to persons or property caused by their failure to keep public roads, highways, streets, avenues, alleys, sidewalks, bridges, viaducts, or public grounds within the subdivisions open, in repair, and free from nuisance * * *."[4]

**{¶ 21}** Appellants contend that under former R.C. 2744.02(B)(3), a fact issue is presented as to whether the glare conditions at the pool constitute a nuisance on public grounds. Pursuant to this exception to immunity, a political subdivision is obligated to keep its public grounds free from nuisance. The phrase "public grounds" has been interpreted to include such areas as municipally owned and controlled parks that are established and maintained for the general public. *Cleveland v. Ferrando* (1926), 114 Ohio St. 207, 150 N.E. 747. We find that an indoor municipal swimming pool, which is open to the general public, also falls within the definition of "public grounds." We must next decide whether there was sufficient evidence presented of a nuisance to overcome the city's motion for a directed verdict.

**{¶ 22}** The phrase "free from nuisance" in former R.C. 2744.02(B)(3) has been interpreted most often by this court in the context of an alleged failure by a political subdivision to keep its roads and highways free from physical obstructions that interfere with visibility and create an unsafe condition. Classic examples of nuisances include a malfunctioning traffic light, a pothole in the roadway, or an overhanging tree limb. See *Franks v. Lopez* (1994), 69 Ohio St.3d 345, 632 N.E.2d 502.

---

4. In *Siebenaler*, a child lost his footing on the ladder of a high diving board and fell to the pool deck while taking swimming lessons in a village swimming pool. Although the court of appeals ultimately found that the village of Montpelier was immune from suit, due to a lack of evidence regarding the presence of a nuisance, the court acknowledged that the nuisance exception of former R.C. 2744.02(B)(3) was relevant.

**{¶ 23}** In *Manufacturer's Natl. Bank of Detroit v. Erie Cty. Rd. Comm.* (1992), 63 Ohio St.3d 318, 587 N.E.2d 819, we held that a fact issue remained as to whether corn growing in the road's right-of-way was a nuisance, since it obstructed the visibility of drivers on the roadway, making the roadway unsafe for travel. Although factually distinguishable from the case at hand, we think that it is pertinent since, in this case, we are also presented with the issue of an obstruction to visibility. Here, there was evidence presented that glare emanating from the wall of glass panels obstructed the lifeguard's view and prevented him from seeing Darrall struggling in the water and ultimately lying at the bottom of the pool. Furthermore, had the court allowed appellants' expert to testify, he would have stated that the glare in this case was a nuisance. This expert testimony is relevant, and the trial court improperly excluded it from the jury.

**{¶ 24}** Not only was there testimony that the glare obstructed the lifeguards' view, but there was also evidence that the city was aware that glare was a problem at the pool. Both the aquatics manager for the city of Cleveland and the recreation center manager testified that they knew that glare was a problem and conceded that lifeguards had not been instructed on how to deal with the glare. They also acknowledged that there were no pool policies addressing this concern. For liability to be imposed on a political subdivision for a nuisance, the political subdivision must have had " 'either actual or constructive knowledge of the nuisance.' " *Franks v. Lopez,* 69 Ohio St.3d at 349, 632 N.E.2d at 505, quoting *Vogel v. Wells* (1991), 57 Ohio St.3d 91, 97, 566 N.E.2d 154, 160. There was sufficient evidence presented to satisfy this notice requirement.

**{¶ 25}** We recognize that glare can exist at all pools (as the aquatics manager testified). Nevertheless, we are not testing the merits of the underlying claim here. Instead, we are deciding whether the trial court erred in directing a verdict for the city, which we believe it did. Consequently, we find that former R.C. 2744.02(B)(3) is applicable here, and that it is for the trier of fact to determine

whether the city created an unreasonable risk of harm by maintaining hazardous glare conditions in the pool.

{¶ 26} Appellants also argue that former R.C. 2744.02(B)(4) is applicable to this case. This exception to immunity provides:

"Political subdivisions are liable for injury, death, or loss to persons or property that is caused by the negligence of their employees and that occurs within or on the grounds of buildings that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and courthouses, but not including jails, places of juvenile detention, workhouses, or any other detention facility, as defined in section 2921.01 of the Revised Code."

{¶ 27} Although former R.C. 2744.02(B)(4) may be applicable to other governmental functions not specifically listed in the statute, we believe that it does not apply to an indoor swimming pool. (See, also, *Mattox v. Bradner* [Mar. 21, 1997], Wood App. No. WD-96-038, unreported, 1997 WL 133330, which held that the exception enumerated in R.C. 2744.02[B][4] is inapplicable to injuries sustained in a municipal swimming pool.) Unlike a courthouse or office building where government business is conducted, a city recreation center houses recreational activities. Furthermore, if we applied former R.C. 2744.02(B)(4) to an indoor swimming pool, liability could be imposed upon the political subdivision. However, there would be no liability if the injury occurred at an outdoor municipal swimming pool, since the injury did not occur in a building. We do not believe that the General Assembly intended to insulate political subdivisions from liability based on this distinction. Therefore, we reject appellants' contention that former R.C. 2744.02(B)(4) applies to an indoor municipal swimming pool.

{¶ 28} Appellants further contend that R.C. 2744.03(A)(5) provides an independent basis for imposing liability on the city. We reject this contention. In *Hill v. Urbana, supra,* 79 Ohio St.3d 130, 679 N.E.2d 1109, a similar argument was made. However, R.C. 2744.03(A)(5) is a defense to liability; it cannot be used to

establish liability. *Id.* at 135, 679 N.E.2d at 1113, fn. 2 (Lundberg Stratton, J., concurring in part and dissenting in part); *id.* at 138-139, 679 N.E.2d at 1116 (Moyer, C.J., dissenting). Therefore, appellants can only argue that the city is not entitled to the defense of R.C. 2744.03(A)(5) because the city acted in a reckless or wanton manner. Appellants do, in fact, contend that a jury question arises as to whether the city acted recklessly in its use of its facility and equipment, in its failure regarding the use of 911 on its emergency phone system.[5]

{¶ 29} R.C. 2744.03(A)(5) provides:

"The political subdivision is immune from liability if the injury [or] death * * * resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner."

{¶ 30} The evidence overwhelmingly established that three city employees were unable to contact 911, despite several attempts to do so. It was further shown that these employees were never trained on the use of the phone system. As a result of their failure to contact 911, there was about a thirty-minute delay in Darrall's treatment.

{¶ 31} The fact that the city had no policy in place or training regarding 911 is appalling. The seriousness of these omissions is highlighted by the fact that more than one hundred swimmers, mostly children unaccompanied by adults, frequented the city pool that day. However, something as basic and important as dialing 911

---

5. Appellants also argue that the city was reckless or wanton in the use of its lifeguard personnel. However, any negligence on the part of the lifeguards falls under R.C. 2744.03(A)(6), not 2744.03(A)(5). See *Fabrey v. McDonald Village Police Dept.* (1994), 70 Ohio St.3d 351, 356, 639 N.E.2d 31, 35. Appellants further argue that the city was reckless or wanton in its use of its facility, by failing to institute a policy concerning the recognition and monitoring of known glare spots. However, we find dispositive the issue of the city's allegedly reckless or wanton use of its equipment, in failing to institute a training policy regarding the use of the 911 emergency phone system.

was not within the city employees' grasp. Not only did two of the senior lifeguards create a dangerous situation by leaving the pool area during an open swim session, but the city, in its admitted failure to train its employees on the use of 911, left them without the knowledge necessary to handle the emergency as it arose. We are unwilling to grant immunity to the city under this provision, and to find, as argued, that the city did nothing wrong on the day Darrall suffered a near drowning.

{¶ 32} This court has defined the term "reckless" to mean that the conduct was committed " 'knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.' " *Marchetti v. Kalish* (1990), 53 Ohio St.3d 95, 96, 559 N.E.2d 699, 700, fn. 2, quoting 2 Restatement of the Law 2d, Torts (1965) 587, Section 500. The conduct by the city regarding its lack of training on the use of 911 presents a question of fact for the jury to consider, which was improperly disposed of by granting the city's motion for directed verdict.

{¶ 33} The standard for directing a verdict is well established. Civ.R. 50(A)(4) provides:

"When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

{¶ 34} In deciding a motion for a directed verdict, neither the weight of the evidence nor the credibility of the witnesses is to be considered. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284, 21 O.O.3d 177, 179, 423 N.E.2d 467, 469. Instead, "[w]hen a motion for a directed verdict is entered, what is being tested is a question of law; that is, the legal sufficiency of the evidence to take the case to

the jury." *Ruta v. Breckenridge-Remy Co.* (1982), 69 Ohio St.2d 66, 68, 23 O.O.3d 115, 116, 430 N.E.2d 935, 938.  The motion for directed verdict must be denied "if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions." *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 115, 4 O.O.3d 243, 244, 363 N.E.2d 367, 368.

{¶ 35} Since reasonable minds can differ as to whether the city allowed a nuisance to exist and as to whether the city acted in a wanton or reckless manner in its use of its facilities and equipment under R.C. 2744.03(A)(5), by failing to institute policies or training regarding the use of the 911 emergency number, we find that the trial court erred in directing a verdict for the city.

{¶ 36} Accordingly, we reverse the judgment of the court of appeals and remand the cause to the trial court for a new trial.

*Judgment reversed*

*and cause remanded.*

PFEIFER, J., concurs and concurs separately.

MOYER, C.J., HADLEY and LUNDBERG STRATTON, JJ., concur in syllabus and judgment.

DOUGLAS and RESNICK, JJ., concur in judgment only.

RONALD E. HADLEY, J., of the Third Appellate District, sitting for COOK, J.

———————————

**Pfeifer, J., concurring.**

{¶ 37} I concur because of my belief that Ohio's sovereign immunity statute is unconstitutional.  See *Garrett v. Sandusky* (1994), 68 Ohio St.3d 139, 141, 624 N.E.2d 704, 706 (Pfeifer, J., concurring).

———————————

**MOYER, C.J., concurring in syllabus and judgment.**

{¶ 38} I believe, as does the majority, that the certified issue should be answered in the affirmative, thereby establishing the legal principle that "a governmental function and the absolute immunity provided it under R.C. 2744.01(C)(2)(U) [are] still subject to the exceptions to immunity provided in R.C. 2744.02(B)(3) and (4)." I therefore concur in the syllabus.

{¶ 39} In applying that syllabus to the case before us, however, I do not believe that the facts of this case fall within the scope of the exception in former R.C. 2744.02(B)(3) for nonliability based on a city's failure to keep public grounds free from nuisance. I disagree with the majority that the existence of glare on the pool water surface establishes a question of fact as to the existence of a nuisance. As acknowledged by the majority, the existence of glare on the water of swimming pools, whether operating in direct or indirect sunlight, is a common and nearly universal phenomenon. While failure to provide procedures to accommodate glare so as to promote safe swimming might arguably constitute negligent operation of a pool, I cannot subscribe to the conclusion that the existence of glare on a swimming pool surface can itself constitute a legal nuisance. To do so would be to effectively endorse the proposition that operation of *any* swimming pool may be equivalent to maintaining a nuisance.

{¶ 40} Rather, I believe that the city's potential liability is based in former R.C. 2744.02(B)(4), which provided at the time of Cater's drowning: "Political subdivisions are liable for injury, death, or loss to persons or property caused by the negligence of their employees and that occurs *within or on the grounds of buildings that are used in connection with the performance of a governmental function * * *.*" (Emphasis added.) As the lead opinion acknowledges, operation of a swimming pool has been expressly designated a governmental function. R.C. 2744.01(C)(2)(u). It follows that liability potentially exists where death is caused by the negligence of city employees on swimming pool property. Although I acknowledge the existence of case law from the courts of appeals to the contrary, in my view both indoor and

15

outdoor pools exist "within or on the grounds" of buildings used in connection with the performance of the governmental function of operating a pool. Indoor pools clearly are "within" buildings. Outdoor pools, while not located within buildings themselves, invariably are located on land that includes buildings, such as bathhouses, shelters, restrooms, storage areas, and offices. I therefore do not accept the conclusion of the majority that application of (B)(4) to this case would result in our creation of an artificial distinction between indoor and outdoor pools in applying the relevant immunity statutes.

{¶ 41} I write separately, as well, to express my disagreement with the majority's analysis of the applicability of the defense provided by R.C. 2744.03(A)(5) to this case. That statute provides immunity to a political subdivision where injury or death "result[s] from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources *unless* the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner." (Emphasis added.) It follows that where decisions as to these matters are made recklessly, the "judgment or discretion" defense is not available to a political subdivision.

{¶ 42} The majority concludes that reasonable minds might find recklessness on the part of the city based solely on its alleged failure to effectively instruct employees in the use of pool telephones to contact emergency services by dialing 911.

{¶ 43} I need not endorse such a conclusion on this record. Determining the point at which behavior rises from the merely negligent to the level of reckless behavior is in every instance problematic. In this case, the plaintiffs produced a litany of facts of decisions and acts demonstrating questionable decision-making on the part of city employees as to, *e.g*., understaffing of lifeguards, failure to compensate for the existence of glare on the water, and inadequate training in emergency procedures. The decision need not be made in this case whether each of these circumstances, standing alone, rises to the level of recklessness. Here a jury viewing *all* of the facts in their

totality might well conclude that the city had acted recklessly in exercising judgment or discretion in connection with the use of pool equipment, personnel, and facilities, thereby precluding application of the defense provided by R.C. 2744.03(A)(5).

{¶ 44} I therefore concur in the syllabus and the judgment only.

HADLEY and LUNDBERG STRATTON, JJ., concur in the foregoing concurring opinion.

———————————