DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellant, Danielle Moore, appeals from the judgment of the Lorain County Court of Common Pleas granting summary judgment in favor of Appellees, Lorain Metropolitan Housing Authority, et al. This Court reverses.
 I. {¶ 2} On October 19, 2003, Appellant and her four children were residing in an apartment owned and operated by Lorain Metropolitan Housing Authority, et al. ("LMHA"), located at 106 South Park Street, Oberlin, Ohio ("the apartment"). *Page 2 
After putting her children to bed, Appellant left the apartment to run some errands. Appellant's former boyfriend, Derek Macarthy, remained at the apartment to watch the children while she was away. During this time, one of her children started a fire in one of the bedrooms. Mr. Macarthy helped two of the children escape the flames. Tragically, Appellant's other two children, Dezirae Anna Nicole Macarthy and D'Angelo Anthony Marquez Macarthy, did not survive.
 {¶ 3} On August 17, 2004, Appellant filed a complaint against LMHA, LMHA's Executive Director, Homer Verdin, and John Does, alleging the wrongful death of her two minor children. More specifically, Appellant alleged that LMHA was negligent in removing the only working smoke detector from the apartment without replacing it with a functional smoke detector. Appellant alleged that because LMHA failed to provide a functional smoke detector, Mr. Macarthy was not awakened in time to rescue Dezirae and D'Angelo. On August 8, 2006, the trial court granted summary judgment in favor of LMHA. Appellant timely appealed the trial court's order, raising two assignments of error for our review.
 II. ASSIGNMENT OF ERROR I "THE TRIAL COURT IMPROPERLY APPLIED THE REVISED CODE § 2744 ANALYSIS."
 {¶ 4} In her first assignment of error, Appellant contends that the trial court improperly applied R.C. 2744 to the within matter. We agree. *Page 3 
 {¶ 5} This Court reviews an award of summary judgment de novo.Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105. We apply the same standard as the trial court, viewing the facts of the case in the light most favorable to the non-moving party and resolving any doubt in favor of the non-moving party. Viock v. Stowe-Woodward Co. (1983),13 Ohio App.3d 7, 12.
 {¶ 6} Pursuant to Civil Rule 56(C), summary judgment is proper if:
 "(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 327.
 {¶ 7} The party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and pointing to parts of the record that show the absence of a genuine issue of material fact. Dresher v. Burt (1996), 75 Ohio St.3d 280, 292-93. Specifically, the moving party must support the motion by pointing to some evidence in the record of the type listed in Civ.R. 56(C). Id. Once this burden is satisfied, the non-moving party bears the burden of offering specific facts to show a genuine issue for trial. Id. at 293. The non-moving party may not rest upon the mere allegations and denials in the pleadings but instead must point to or submit some evidentiary material that demonstrates a genuine dispute over a material fact. Henkle v.Henkle (1991), 75 Ohio App.3d 732, 735. *Page 4 
 {¶ 8} In determining whether a political subdivision is immune from liability, this Court must engage in a three-tier analysis. Cater v.Cleveland (1998), 83 Ohio St.3d 24, 28. The first tier is the premise under R.C. 2744.02(A)(1) that:
 "[e]xcept as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."
 {¶ 9} The second tier involves the five exceptions set forth in R.C.2744.02(B), any of which may abrogate the general immunity delineated in R.C. 2744.02(A)(1). Cater, 83 Ohio St.3d at 28. Lastly, under the third tier, "immunity can be reinstated if the political subdivision can successfully argue that one of the defenses contained in R.C. 2744.03
applies." Id.
Proprietary or Governmental Function
 {¶ 10} In its decision granting summary judgment in favor of LMHA, the trial court held that "the provision of low-income housing is a governmental function[.]" The trial court cited no case law in support of this conclusion. Upon review of relevant Ohio case law, we find conflicting decisions regarding whether the operation of a public housing project is a governmental function. We begin our analysis by examining the definitional provisions of governmental and proprietary functions set forth in R.C. 2744.01. R.C. 2744.01(C)(1) states: *Page 5 
 "`Governmental function' means a function of a political subdivision that is specified in division (C)(2) of this section or that satisfies any of the following:
 "(a) A function that is imposed upon the state as an obligation of sovereignty and that is performed by a political subdivision voluntarily or pursuant to legislative requirement;
 "(b) A function that is for the common good of all citizens of the state;
 "(c) A function that promotes or preserves the public peace, health, safety, or welfare; that involves activities that are not engaged in or not customarily engaged in by nongovernmental persons; and that is not specified in division (G)(2) of this section as a proprietary function."
 {¶ 11} Ownership and operation of a public housing facility is not specifically identified in R.C. 2744.01(C)(2). However, R.C.2744.01(C)(2)(q) lists "[u]rban renewal projects and the elimination of slum conditions" as governmental functions. Notably, R.C. 2744.01(C)(2) does not provide an exhaustive list of governmental functions.
 {¶ 12} Proprietary functions of political subdivisions are defined in R.C. 2744.01(G)(1) as
 "a function of a political subdivision that is specified in division (G)(2) of this section or that satisfies both of the following:
 "(a) The function is not one described in division (C)(1)(a) or (b) of this section and is not one specified in division (C)(2) of this section;
 "(b) The function is one that promotes or preserves the public peace, health, safety, or welfare and that involves activities that are customarily engaged in by nongovernmental persons." *Page 6 
Ownership and operation of a public housing facility is not identified in R.C. 2744.01(G)(2). However, as with R.C. 2744.01(C)(2), the list of proprietary functions is not limited to functions identified under R.C.2744.01(G)(2).
 {¶ 13} LMHA relies on Rhoades v. Cuyahoga Metro. Hous. Auth, 8th Dist. No. 84439, 2005-Ohio-505, and McCloud v. Nimmer (1991),72 Ohio App.3d 533, to support its contention that the provision and maintenance of public housing is a governmental function. Rhoades involved a suit brought by a resident of a public housing facility, Maurice Rhoades, against the housing authority. In his suit, Rhoades filed several claims including defamation, employment discrimination and a 42 U.S.C. 1983
action arising out of his arrest for menacing the housing authority's staff. On appeal, the Eighth District Court of Appeals affirmed the trial court's decision that the housing authority was entitled to immunity. The Rhoades court held that the provision of public housing is a governmental function and that none of the exceptions listed under R.C. 2744.02(B)(1) applied.
 {¶ 14} McCloud involved an action commenced by a shooting victim against, among others, Eric Nimmer, a Cleveland police officer, and the City of Cleveland for negligence in its training of police officers. McCloud was accidentally shot by Nimmer while Nimmer was visiting him at his home, a metropolitan housing unit. The trial court granted summary judgment in favor of Nimmer and Cleveland. On appeal, McCloud argued that Cleveland should be held liable for Nimmer's actions because he was shot while at his residence, a unit *Page 7 
of the Cleveland Metropolitan Housing Authority. McCloud,72 Ohio App.3d at 538. Without citation to authority, McCloud asserted that the housing unit is used in connection with the performance of the governmental function of providing housing to the indigent and that, therefore, liability should be imposed under R.C. 2744.02(B). Id. at 538-39. R.C.2744.02(B)(4) imposes liability on political subdivisions for injury "caused by the negligence of their employees and that occurs within or on the grounds of * * * buildings that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and courthouses[.]" The McCloud court found the R.C.2744.02(B)(4) exception inapplicable, concluding that the city was immune from liability because a government housing unit does not constitute a building used in connection with the performance of a government function. Id. at 539.
 {¶ 15} The only analysis the Eighth District undertook inMcCloud with regard to governmental versus proprietary functions was its discussion of the city's act of training police officers. Id. at 536-38. The McCloud court concluded that the city's act of training police officers constituted a governmental function because police services are specifically defined as a governmental function under R.C.2744.01(C)(2)(a). Id. at 538.
 {¶ 16} Appellant relies on the Second District Court of Appeals' decision in Parker v. Dayton Metro. Hous. Auth. (May 31, 1996), 2d Dist. No. 15556, to support her assertion that the provision of public housing is a proprietary function. *Page 8 Parker involved an appeal from a grant of summary judgment in favor of a public housing authority in an action brought by one of its tenants for injuries suffered by her minor child when he fell from an open window in her apartment. Parker filed claims for negligence, recklessness and willful and wanton misconduct of the housing authority for its failure to make repairs on or alterations to the window from which her son fell. Parker alleged that the housing authority knew the window was in need of repair and was accessible to small children.
 {¶ 17} The trial court found that the operation of a public housing facility is a governmental function for which the housing authority could not be held liable under R.C. 2744.02(B)(4). The Second District Court of Appeals carefully analyzed the definitions of governmental and proprietary functions and classified ownership and operation of a public housing authority as a proprietary function. Id. at *3. TheParker court noted that in McCloud the plaintiffs argued that "the activity of the public housing authority which gave rise to their claims for relief is governmental, without supporting authority or analysis." (Emphasis omitted.) Id. at *2. In reaching its decision to the contrary, the Parker court applied the definition of "governmental function" set forth in R.C. 2744.01(C)(1), analyzing each element of the definition as follows:
 "Maintenance of a public housing facility is voluntary but it is not a function that is imposed on the state as an obligation of sovereignty. Its benefits are conferred only on the limited part of the population that uses it. The activity promotes the public peace, health, safety, and welfare; however, it is a function which involves activities that are customarily engaged in by nongovernmental persons, in this *Page 9 
instance private landlords who rent residential premises to tenants." Id.
However, the Parker court ultimately affirmed summary judgment, finding that the housing authority had discretion to forego installation of window screens and could not be held liable for this discretionary decision.
 {¶ 18} Subsequently, the Sixth District Court of Appeals examined this issue in Jones v. Lucas Metro. Hous. Auth. (Aug. 29, 1997), 6th Dist. No. L-96-212. Jones involved a complaint brought by tenants of a subsidized housing complex who were burglarized shortly after asking the housing authority to change the locks on their apartment. The Sixth District, relying on Country Club Hills Homeowners Assn. v. JeffersonMetro. Hous. Auth. (1981), 5 Ohio App.3d 77, 78, in which the Seventh District stated that "`a metropolitan housing authority is a political subdivision of the State of Ohio which by delegation performs state functions which are governmental in character[,]'" held that the housing authority's operation of the housing unit is a governmental function.Jones, at *4. However, Judge Sherck wrote a concurrence in which he agreed with the Second District's decision in Parker, stating:
 "LMHA is a landlord. As such, it is involved in an activity which is customarily engaged in by nongovernmental persons. Moreover, even though LMHA may be a governmental entity, being a landlord is not one of the statutorily defined governmental functions. Consequently, I agree with the opinion of the Second District Court of Appeals which held that, `* * * ownership of and operation of a residential public housing facility is not a governmental activity but a proprietary function * * *' subject to the same liability for civil *Page 10 
wrongs as any other landlord." Id., at *6 (Sherck, J. concurring), quoting Parker, supra.
 {¶ 19} LMHA contends that public housing facilities are mandated by the General Assembly. However, R.C. 3735.27, which governs the creation of a housing authority, establishes that the decision to create a housing authority is discretionary:
 "(A) Whenever the director of development has determined that there is need for a housing authority in any portion of any county that comprises two or more political subdivisions or portions of two or more political subdivisions but is less than all the territory within the county, a metropolitan housing authority shall be declared to exist, and the territorial limits of the authority shall be defined, by a letter from the director. The director shall issue a determination from the department of development declaring that there is need for a housing authority within those territorial limits after finding either of the following[.]" (Emphasis added.)
 {¶ 20} The statute cited by LMHA, R.C. 3735.31, provides the powers of metropolitan housing authorities; it does not mandate the creation of a housing authority. LMHA is not obligated to operate a public housing facility but rather, LMHA voluntarily maintains the facility. R.C.2744.01(C)(1)(a). The provision of public housing is a function that "promotes or preserves the public peace, health, safety, or welfare[.]" R.C. 2744.01(G)(1)(b). The housing facility provides a benefit to a limited portion of the population. R.C. 2744.01(C)(1)(b). Most notably, the service provided by LMHA is a service customarily engaged in by nongovernmental persons, i.e. landlords. R.C. 2744.01(C)(1)(c) and (G)(1)(b). Like tenants in a private rental relationship with a private landlord, Appellant *Page 11 
signed a lease agreement with LMHA. R.C. 2744.01(G)(1)(b). The agreement contained the same types of terms as those contained in private lease agreements including a lease term, Appellant's obligations with regard to utilities, occupancy terms, and LMHA's obligations with regard to the apartment. Id.
 {¶ 21} We are also persuaded by the Second District Court of Appeals decision in Parker. In contrast to the Parker decision, theMcCloud and Rhoades courts did not rely on the definitions set forth in R.C. 2744.01(C)(1) and (G)(1) to make their determinations. Although operation of a housing authority is not specifically identified in 2744.01(C)(2) or R.C. 2744.01(G)(2), under our analysis of the criteria set forth in R.C. 2744.01(C)(1) and (G)(1) and pertinent case law, we find that ownership and operation of a public housing facility is a proprietary function.
R.C. 2744.02(B)(5) Exception to Political Subdivision Immunity
 {¶ 22} Appellant argues that the only exception to political subdivision immunity applicable in this case arises out of R.C.2744.02(B)(5), which states that political subdivisions are liable for injury or death
 "(5) In addition to the circumstances described in divisions (B)(1) to (4) of this section, a political subdivision is liable for injury, death, or loss to person or property when civil liability is expressly imposed upon the political subdivision by a section of the Revised Code, including, but not limited to, sections 2743.02
and 5591.37 of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon a political subdivision, because that section provides for a criminal penalty, because of a general authorization in that section that a political *Page 12 
subdivision may sue and be sued, or because that section uses the term `shall' in a provision pertaining to a political subdivision."
 {¶ 23} Appellant contends that LMHA was her landlord and as such, it was subject to the requirements set forth in R.C. 5321.04(A)(4), the Ohio Landlord/Tenant Act, and R.C. 3735.40, which sets forth definitions regarding housing projects. R.C. 5321.04(A)(4) enumerates the statutory obligations for a landlord and mandates that a landlord "[maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating, and air conditioning fixtures and appliances, and elevators, supplied or required to be supplied by him[.]" Appellant also contends that LMHA is subject to the requirements set forth in O.A.C. 4101:2-89-04, which requires smoke detectors within private areas.
 {¶ 24} This Court has implicitly found R.C. 5321.04 applicable to housing authorities. See Robinson v. Akron Metro. Hous. Auth. (Aug. 1, 2001), 9th Dist. No. 20405, and Wayne Metro. Hous. Auth. (Oct. 12, 1988), 9th Dist. Nos. 2369, 2403. In Robinson, this Court examined whether R.C. 5321.04 requires that a landlord receive notice of a defective condition in order to be liable. As in this case, the landlord in Robinson was a metropolitan housing authority. We found that R.C.5321.04 requires such notice to impose liability on a landlord.Robinson, at *4.
 {¶ 25} R.C. 5321.04(A)(1) requires a landlord to comply with the requirements of all applicable housing, building, health and safety codes. O.A.C. *Page 13 
4101:2-89-04 states that smoke detectors are required within private areas. O.A.C. 4101:2-89-04(A) provides, in part, that "[e]ach dwelling unit, apartment, and condominium unit shall have at least one smoke detector installed in the immediate vicinity but outside of all sleeping rooms." While the decision to create a housing authority is discretionary, if a governmental entity chooses to create a housing authority, the entity is bound by the requirements of all applicable housing, building, health and safety codes. R.C. 5321.04(A)(1).
 {¶ 26} Homer Verdin, Executive Director of LMHA, testified that a smoke detector was installed in the apartment on October 22, 1998. Mr. Verdin testified that LMHA is required to meet building codes, housing codes and HUD regulations. Mr. Verdin agreed that LMHA is required by state and federal law to provide smoke detectors. He explained that LMHA is obligated to make sure there is an operable smoke detector present. Mr. Verdin stated that LMHA contracted with The Inspection Group, a private company, who performed the required HUD inspections for them.
 {¶ 27} Mr. Verdin testified that LMHA protocols for work orders in LMHA housing units required residents or maintenance personnel to call the work order center in order to have work performed. Mr. Verdin acknowledged, however, that situations arise wherein maintenance work is performed without a work order.
 {¶ 28} Michael Burnley, a maintenance worker for LMHA, also provided deposition testimony. Mr. Burnley also agreed that he occasionally performed *Page 14 
work without a work order. Mr. Burnley testified that he accompanied The Inspection Group employee when he conducted the yearly HUD safety inspections at the Oberlin housing facility in October of 2003. The inspection of the apartment was conducted on October 6, 2003 and The Inspection Group generated a report regarding this inspection on October 8, 2003. Mr. Burnley testified that he remembered testing the smoke detector in the apartment and that it worked. He did not recall having any conversations with Appellant regarding the smoke detector not working. He also conducted a follow-up inspection of the apartment. Mr. Burnley could not recall all the work he did during the follow-up inspection and had not seen a document that identified the work he performed during the follow-up inspection.
 {¶ 29} Appellant testified that on the day of the fire, there was no smoke detector present in the apartment. Specifically, Appellant testified as follows:
 "Q: When did they take it out?
 "A: It was on a Saturday, on Sweetest Day, which would make it the 17th.
 * * *
 "Q: Who took it out?
 "A: Mike [Burnley] came in with a man. And * * * he * * * asked about things that were needed to be done in the house. And the first thing I mentioned was about the smoke detector. And the guy checked it, and then he asked Mike if he had one out on the truck. Mike went outside and looked on the truck and said he didn't have one. And then the guy said that he will replace it later. *Page 15 
 "Q: And again under oath, your testimony is that this was done on October 17, 2005, is that correct, Sweetest Day, I thought that's what you said?
 "A: October 17th of 2003.
 "Q: 2003. I'm sorry."
Appellant later testified that no one ever replaced the smoke detector.
 {¶ 30} Derrick Macarthy also testified. Mr. Macarthy testified that on the night of October 17, 2003, he relaxed on the couch while Appellant ran errands. He testified that all the children were in bed at this time. He testified that he had not consumed any alcoholic beverages nor taken any drugs on October 17, 2003. Mr. Macarthy eventually fell asleep. Mr. Macarthy testified that he was awakened by the fire. Upon seeing the fire, he grabbed his two oldest children, who were standing by the couch, and took them to the neighbor's house. He testified that he "tried to go back in the house, the flames were right there behind the door that [he] just came out of." Mr. Macarthy testified that he is certain that he did not hear a smoke alarm.
 {¶ 31} All the firefighters that testified stated that they did not hear a smoke alarm at any time during their fire suppression efforts. Steven John Chapman, an Oberlin fireman who responded to the fire, testified that he did not hear a smoke alarm when he entered the apartment. He testified that there have been other times that he has responded to house fires where he heard the smoke alarm upon entering the home. Benedict John Ryba, another Oberlin fireman that responded to *Page 16 
the scene, testified that he did not hear a smoke alarm. Like Mr. Chapman, he also testified that he has heard smoke alarms when responding to other house fires.
 {¶ 32} Dennis Kirin, Oberlin Fire Chief, similarly testified that he did not hear a smoke alarm when he entered the apartment. He also stated that he recalled other instances where he heard smoke alarms during his fire suppression efforts. Mr. Kirin testified that during his inspection of the apartment after the fire, he found some plastic debris on the floor that could possibly have been the smoke detector. However, because of the significant fire damage, he could not confirm that it was actually a piece of the smoke detector. He did not find anything during his investigation that "resembled any remnants of the mechanical or electronic portion of what might be considered a detector." Mr. Kirin also stated that he located the carbon monoxide detector and that it was fully intact. Mr. Kirin testified that in the investigation report, he indicated that he could not determine whether there had been a smoke detector at the apartment. He explained that "after we did the investigation of the interior and we did as much debris searching and removal that we could, we could not ascertain positively that there was a smoke detector in the debris."
 {¶ 33} Viewing the testimony in the light most favorable to Appellant, the nonmoving party, we find that Appellant met her reciprocal burden by offering specific evidence to demonstrate a genuine issue of material fact as to whether LMHA complied with statutory requirements that it provide a working smoke *Page 17 
detector. Dresher, 75 Ohio St.3d at 292-93; Henkle,75 Ohio App.3d at 735. There is conflicting testimony regarding whether the smoke detector was removed and/or replaced. No one testified that he heard a smoke alarm either during the fire or during the suppression efforts. Furthermore, no one who inspected the apartment after the fire could definitively determine whether there was a smoke detector in the apartment at the time of the fire. This is a matter for resolution by the finder of fact. Accordingly, Appellant's first assignment of error is sustained.
 ASSIGNMENT OF ERROR II "THE TRIAL COURT ERRED IN ITS DETERMINATION OF FACTS, RELYING UPON THE CREDIBILITY OF WITNESSES, HEARSAY AND EVIDENCE WHICH WAS IMPROPER PURSUANT TO RULE 56(C) OF THE OHIO RULES OF CIVIL PROCEDURE."
 {¶ 34} In light of our disposition of Appellant's first assignment of error, Appellant's second assignment of error is rendered moot.
 III. {¶ 35} Appellant's first assignment of error is sustained. Appellant's second assignment of error is moot. The judgment of the Lorain County Court of Common Pleas is reversed and the cause remanded for further proceedings.
 Judgment reversed and cause remanded. *Page 18 
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellees.
WHITMORE, J. CONCURS