DECISION. *Page 2 
{¶ 1} Defendants-appellants, the city of Cincinnati and four unnamed city employees working as 911 operators and 911 supervisors, appeal the trial court's judgment denying their motion to dismiss plaintiff-appellee Lynetta Myrick's complaint against them.[1] The complaint alleged that they had acted willfully, wantonly, and recklessly in responding to Myrick's emergency request for assistance after her young child had been abducted by Myrick's presumed-to-be mentally ill, estranged husband. Because the city's employees did not act recklessly by directing Myrick to pull over to speak to a police officer or to return to her home to obtain police assistance, the city and its employees were immune from liability for the death of Myrick's daughter under R.C. Chapter 2744, the Political Subdivision Tort Liability Act. Therefore, we reverse the trial court's refusal to dismiss Myrick's complaint.
 I. The 911 Emergency Calls {¶ 2} On the evening of October 6, 2005, Myrick, accompanied by her three children, was confronted by her estranged husband, Darius Myrick, when she returned home from the grocery store. Darius, who did not reside with the family or have custodial rights, appeared intoxicated or mentally ill. He demanded that Myrick give him the keys to her car. When Myrick refused to give him the keys, he grabbed Myrick's youngest child, 18-month-old Aliyah, from her arms and fled down the street, making statements that he was going to harm the child.
 {¶ 3} A neighbor heard Myrick's shouts and called 911. The neighbor told the 911 operator what she had seen and heard, and provided Myrick's address and *Page 3 
physical description. Shortly thereafter, Myrick called 911. Myrick told the 911 operator that her mentally ill, estranged husband had kidnapped her baby and was fleeing on foot with the child. Myrick indicated that she feared for her daughter's physical safety. After she had provided the operator with a description of the clothing her husband was wearing at the time of the kidnapping, Myrick's phone failed and her communication with 911 was disconnected.
 {¶ 4} A second neighbor who had overheard the incident offered to drive Myrick in an effort to follow and maintain visual contact with her husband and child until the police arrived. While in the neighbor's car, Myrick placed a second call to 911, spoke to a different operator, and repeated the original account, adding that her husband did not have custody of the child. She also told the operator that she could see her daughter and estranged husband, and that she was pursuing them in a car as he headed down the street on foot with the child in his arms.
 {¶ 5} The second 911 operator questioned Myrick about the custody of the child and advised Myrick that she would have to "pull over" if she wanted to speak with police. The operator also told Myrick that the police were waiting for her at her apartment and that she needed to return to that location, which was one-half mile away, if she wanted police assistance. Myrick stopped following her husband and returned to her apartment. Two days later her daughter was found dead, the victim of blunt force trauma. Darius Myrick was charged with the child's murder.
 {¶ 6} Myrick sued the city, the two unnamed 911 operators, and two unnamed 911 supervisors, asserting claims for wrongful death, intentional infliction of emotional distress, negligent infliction of emotional distress, negligent training and supervision, and tortious interference with a familial relationship. Prior to filing *Page 4 
an answer, the city and its employees moved to dismiss the complaint, claiming that they were immune from liability. Following a hearing, the trial court overruled the motion without opinion.
 II. Standard of Review {¶ 7} On appeal, the city and its employees assert, in a single assignment of error, that the trial court erred by overruling their motion to dismiss. We review a trial court's ruling on Civ. R. 12(B)(6) motion to dismiss de novo.[2] We must consider all the plaintiffs factual allegations to be true, and all reasonable inferences must be drawn in favor of the plaintiff.[3] A motion to dismiss under Civ. R. 12(B)(6) should only be granted when a plaintiff can prove no set of facts that would entitle her to relief.[4]
 {¶ 8} The city argues that its motion to dismiss should have been granted because the city was immune from liability under R.C. 2744.02(A)(1) and its employees were immune from liability under R.C. 2744.03(A)(6).
 III. The City's Immunity {¶ 9} A reviewing court must engage in a three-tiered analysis to determine whether a political subdivision is entitled to immunity from civil liability pursuant to R.C. Chapter 2744.[5] The first tier in the analysis is to determine whether the entity claiming immunity is a political subdivision and whether the alleged harm occurred in connection with a governmental or a propriety function.[6] The general rule is that political subdivisions are not liable in damages. But if it is determined that an entity *Page 5 
is a political subdivision entitled to immunity under the first tier in the analysis, then the court must move to the second tier and determine whether any of the exceptions to immunity enumerated in R.C. 2744.02(B) apply.[7] If any of the R.C. 2744.02(B) exceptions to immunity are found to be applicable, then the political subdivision can reclaim its immunity under the third tier by proving that one of the defenses to liability in R.C. 2744.03 applies.[8]
 {¶ 10} With respect to the first tier of the analysis, it is undisputed in this case that the city is a political subdivision and that the alleged harm occurred in connection with the governmental function of providing "police, fire, emergency medical, ambulance, and rescue services or protection."[9] Thus, immunity existed for the city unless one of the exceptions set forth in R.C. 2744.02(B) applied.
 {¶ 11} Myrick argues that two exceptions applied to remove the city's immunity: R.C. 2477.02(B)(4) and 2744.02(B)(5). R.C. 2744.02(B)(4) provides that "political subdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function." Because it is clear on the face of Myrick's complaint that her daughter's death was not due to a physical defect within or on the grounds of a building used in connection with a governmental function, we hold that this exception did not apply to impose liability on the city.
 {¶ 12} R.C. 2744.02(B)(5) provides that "a political subdivision is liable for injury, death, or loss to person or property when liability is expressly imposed upon *Page 6 
the political subdivision by a section of the Revised Code * * *." Myrick argues that R.C 4931.49(A) expressly imposes liability upon the city when a person suffers injury and that injury is caused by willful or wanton misconduct in the operation of the city's 911 system. Specifically, R.C. 4931.49(A)(4) provides that "the state, the state highway patrol or a subdivision participating in a 9-1-1 operating system established under sections 4931.40 to 4931.70 of the Revised Code and any officer, agent, employee or independent contractor of the state, the state highway patrol, or such a participating subdivision is not liable in damages in a civil action for injuries, death, or loss to persons or property arising from any act or omission, except willful orwanton misconduct, in connection with developing, adopting or approving any final plan or any agreement made under section 4931.48 of the Revised Code or otherwise bringing into operation the 9-1-1 system pursuant to sections 4931.40 to 4931.70 of the Revised Code."
 {¶ 13} Even if this statute exposed the city to potential liability, we hold that the R.C. 2744.02(B)(5) exception did not apply to remove the city's immunity under R.C. 2744.01(A). Here, Myrick alleged that the city had failed to "create and implement adequate policies and procedures pertaining to emergency response and dispatch." This allegation is really an inference that Myrick would have us make based on her other allegation that the city's employee, the 911 dispatcher, had acted in a reckless and wanton manner with respect to her communication with Myrick during the abduction of Myrick's child. But the allegation that the city employees had acted recklessly was a legal conclusion based on Myrick's factual allegation that the 911 dispatcher had told Myrick, who had her daughter in plain view, to pull over to speak to a police officer or to return to her apartment to receive police assistance. *Page 7 
Taking these factual allegations as true, as we are required to do, we hold that, as matter of law, the 911 dispatcher's communication with Myrick did not amount to reckless or wanton misconduct.
 {¶ 14} Wanton misconduct has been defined by the Ohio Supreme Court as the "failure to exercise any care whatsoever."[10] In further explanation, the court has said that "`mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor.' Such perversity must be under such conditions that the actor must be conscious that his conduct will in all probability result in injury."[11]
 {¶ 15} The facts alleged in Myrick's complaint, as a matter of law, did not demonstrate that the 911 dispatcher had acted in a willful or wanton manner in directing Myrick to stop the pursuit of her estranged husband and either to pull over to speak to the police or to return to her apartment to get police assistance.[12] Here, the complaint demonstrates that the 911 dispatcher gave Myrick two options, and we cannot say that either of those options was unreasonable. Both options attempted to keep Myrick safe and to effectively respond to the kidnapping of her daughter. Furthermore, there was no allegation, nor can we make any inference from the facts stated, that the 911 dispatcher believed that her directions to Myrick that evening would have "in all probability result[ed] in injury." *Page 8 
 {¶ 16} Because we have determined, as a matter of law, that the 911 dispatcher did not act in a willful or wanton manner, there are no other allegations in Myrick's complaint to support an inference that the city had acted in a willful or wanton manner by failing to "create and implement adequate policies and procedures pertaining to emergency response and dispatch." Accordingly, because the complaint had no allegations to invoke one of the exceptions to immunity set forth in R.C. 2744.02(B), we hold that the city is immune from liability in the death of Myrick's daughter.
 IV. Immunity of City Employees {¶ 17} R.C. 2744.03(A)(6) creates a presumption of immunity for employees of a political subdivision.[13] It provides that an individual employee is immune from liability in performing his job unless (a) his acts or omissions are manifestly outside the scope of his employment; (b) his acts or omissions are malicious, in bad faith, or wanton or reckless; or (c) liability is expressly imposed upon the employee by another statute. Myrick alleged in her complaint that the unnamed 911 dispatchers had acted in a wanton or reckless manner in their communications with her on the date in question, and that the unnamed 911 supervisors had been wanton or reckless in their failure to sufficiently train or supervise the 911 operators.
 {¶ 18} The Ohio Supreme Court has defined the term "reckless" to mean that the conduct occurred with the individual "knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially *Page 9 
greater than that which is necessary to make his conduct negligent."[14] Recklessness has also been defined as "the perverse disregard of a known risk."[15]
 {¶ 19} Again, we must determine whether the facts alleged in Myrick's complaint established that the unnamed city employees had acted in a reckless or wanton manner in their communication with Myrick on the evening in question. But as we have previously noted with respect to wanton misconduct, there were no facts alleged in the complaint that supported a finding that the 911 dispatcher had acted recklessly or demonstrated a perverse disregard for a known risk. The 911 dispatcher had a range of available options and chose to direct Myrick to either pull over her car where she was or return to her home where there were police officers waiting. Because this was reasonable assistance and did not indicate a perverse disregard of a known risk, there were no facts to demonstrate that the unnamed 911 supervisors had failed to properly train and supervise the emergency dispatchers. Accordingly, the employees were entitled to immunity under R.C. 2744.03(A)(6).
 {¶ 20} We are saddened by the death of Myrick's daughter and it is a tragedy. The city, however, is not liable to Myrick for that death. The 911 dispatchers' response to the emergency did not indicate that they had "exercised no care whatsoever." Instead, Myrick's complaint indicated that the 911 dispatchers had communicated with Myrick, attempting to connect her with police assistance in a safe and timely manner.
 {¶ 21} Because the city and its employees were immune from liability, the trial court erred by denying their motion to dismiss Myrick's complaint under *Page 10 
Civ. R. 12(B)(6). We reverse the judgment of the trial court and remand this case for the entry of the dismissal to which the city and its employees are entitled as a matter of law.
Judgment reversed and cause remanded.
DINKELACKER, J., concurs.
HILDEBRANDT, P.J., dissents.
[1] This is a final appealable order. See R.C.2744.02(C); Hubbell v.Zenia, 115 Ohio St.3d 77, 2007-Ohio-4839, 873 N.E.2d 878.
[2] Battersby v. Avatar, Inc., 157 Ohio App.3d 648, 2004-Ohio-3324,813 N.E.2d 46, at ¶ 5.
[3] Id.
[4] O'Brien v. University Community Tenants Union, Inc. (1975), 42 Ohio St.2d 242, 245, 327 N.E.2d 753.
[5] Hubbard v. Canton City School Bd. of Edn., 97 Ohio St.3d 451,2002-Ohio-6718, 780 N.E.2d 543, at ¶ 10, citing Cater v. Cleveland,83 Ohio St.3d 24, 28, 1998-Ohio-421, 697 N.E.2d 610.
[6] R.C. 2744.02(A)(1); Hubbard, supra, at ¶ 10.
[7] Cater, supra, at 28.
[8] Id.
[9] R.C. 29744.01(C)(2)(a).
[10] Fabrey v. McDonald Village Police Dept., 70 Ohio St.3d 351, 356,1994-Ohio-368, 639 N.E.2d 31.
[11] Id.
[12] Although the dissent argues that Myrick's allegation that the import of the second dispatcher's direction was that Myrick would not receive assistance in any manner unless she returned to her apartment, this is belied by Myrick's own factual assertion that the dispatcher had told her that she could pull over and talk to police. Given that factual allegation, we cannot say that the complaint supports an inference that the 911 dispatcher told Myrick that she would not receive any assistance from the police unless she returned to her residence.
[13] See Lambert v. Hartman, 1st Dist. No. C-070600,2008-Ohio-4905, at ¶ 12.
[14] Cater, supra, at 33, citing Marchetti v. Kalish (1990),53 Ohio St.3d 95, 96, 559 N.E.2d 699; see also, Copeland v. Cincinnati,159 Ohio App.3d 833, 840, 2005-Ohio-1179, 825 N.E.2d 681, at ¶ 16.
[15] Thompson v. McNeil (1993), 53 Ohio St.3d 102, 104-105,559 N.E.2d 705.